# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE DIVISION

JONATHAN WONG,                                    :
                                                  :
     Plaintiff,                                 :
                                                  :
v.                                                :     Case No. <u>6:24-cv-1410</u>
                                                  :
FEDERAL TRADE COMMISSION;                         :     Hon. Judge _____
                                                  :
<u>Service pursuant to Fed. R. Civ. P. 4(i)(1),(2):</u>    :
Hon. Brandon Bonaparte Brown, U.S. Attorney       :
Western District of Louisiana                     :
800 Lafayette Street, Suite 2200                  :
Lafayette, LA 70501-6832                          :
                                                  :
Federal Trade Commission                          :
Attn: Civil Process Clerk                         :
U.S. Attorney General                             :
950 Pennsylvania Avenue, NW                       :
Washington, DC 20530-0001                         :
                                                  :
Federal Trade Commission                          :
600 Pennsylvania Avenue, NW                       :
Washington, DC 20580                              :
                                                  :
AND                                               :
                                                  :
HORSERACING INTEGRITY AND                         :
SAFETY AUTHORITY, INC.,                           :
                                                  :
<u>Service pursuant to Fed. R. Civ. P. 4(h):</u>         :
John C. Roach, Registered Agent                   :
176 Pasadena Drive                                :
Building One                                      :
Lexington, KY 40503                               :
                                                  :
     Defendants.                                :
_____           :

## <u>VERIFIED COMPLAINT</u>

Plaintiff Jonathan Wong, for his Verified Complaint against Defendants the Federal Trade Commission ("FTC") and Horseracing Integrity and Safety Authority, Inc. ("Authority"), states as follows:

## I.    INTRODUCTION

1.    Wong brings this action because the Horseracing Integrity and Safety Act ("HISA") and the regulations promulgated under it ("HISA Rules") are unconstitutional. HISA and the HISA Rules are unconstitutional because, ***first***, HISA's delegation of federal regulatory power to the Authority violates the private nondelegation doctrine, and, ***second***, because HISA and the HISA Rules violate the Seventh Amendment's right to a jury trial.

2.    Wong also brings this action because the Authority's enforcement of the HISA Rules against him—through a contracted private entity—violated Wong's Due Process rights.

3.    Relatedly, Wong brings this action to appeal the final decision and civil sanctions imposed against him from the Authority's enforcement action.

4.    The Court should declare HISA and the HISA Rules to be unconstitutional, preliminarily and permanently enjoin Defendants from enforcing HISA and the HISA Rules against Wong, and vacate the final decision and civil sanctions imposed against Wong.

## II.    PARTIES, JURISDICTION, AND VENUE

5.    Wong is an individual who resides at 5180 Highway 182, Opelousas, LA 70570.

6.    The Authority is a nonprofit Delaware corporation, but it has fallen woefully short of any nonprofit mission it could claim. HISA authorizes the Authority to develop and implement rules for a horseracing anti-doping and medication control program ("ADMC Program") and a racetrack safety program that preempts state regulation.

7.      The FTC is the federal agency given limited authority under HISA. Its headquarters are in Washington, DC.

8.      The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this case presents claims arising under the U.S. Constitution. The Court also has subject-matter jurisdiction under 28 U.S.C. § 1337 because HISA purports to regulate commerce. The Court may grant the requested injunctive relief pursuant to 5 U.S.C. § 706 and Fed. R. Civ. P. 65. The Court may grant the requested declaratory judgment pursuant to 28 U.S.C. §§ 2201-2202 and Fed. R. Civ. P. 57.

9.      Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the Verified Complaint occurred within this judicial district, including that Wong resides and is suffering harm in this judicial district. Venue is also proper under 28 U.S.C. § 1391(b)(3) because the FTC and the Authority are subject to this Court's personal jurisdiction. Venue is proper under 28 U.S.C. § 1391(e)(1) because the FTC is an agency of the United States and is deemed to reside in this judicial district, a substantial part of the events or omissions giving rise to the Verified Complaint occurred in this judicial district, and Wong resides in this judicial district.

III.    **FACTS**

A.      **The Authority is unaccountable for its exercise of federal regulatory power.**

        *HISA's broad delegation of federal regulatory power to the Authority*

10.     For more than 100 years, Thoroughbred racing in the United States has been regulated solely by states through their traditional police powers. That dynamic was dramatically upended when, in 2020, HISA became federal law. *See generally* 15 U.S.C. §§ 3051-3060.

11.     HISA purports to nationalize the regulation of horseracing uniformly across the country. To do so, HISA unconstitutionally grants to the Authority, which is a nongovernmental,

private, independent, self-regulatory, nonprofit corporation, the power to develop and enforce the ADMC Program and a racetrack safety program in preemption of existing state regulations.

12.     HISA's legislative mandate is sweeping, covering virtually all aspects of horseracing. *See id.* §§ 3053(a), 3054(a). The Authority "exercise[s] independent and exclusive national authority over . . . all horseracing safety, performance, and anti-doping and medication control matters for covered horses, covered persons, [and] covered horseraces." *Id.* § 3054(2). A "Covered Horse" is any thoroughbred horse subject to HISA, and "Covered Horserace" is any horserace involving Covered Horses. *Id.* § 3051(4),(5).

13.     Despite being a "private" entity, the Authority is empowered with broad federal regulatory authority and sits jurisdictionally within a federal regulatory agency—the FTC.

14.     HISA's delegation of federal regulatory authority to the Authority is breathtakingly broad. Generally, the Authority may, among other things, regulate the horseracing industry throughout the United States and collect and spend fees from those it regulates. *Id.* § 3052(3)(C).

15.     Specifically, the Authority may adopt rules governing doping, medication control, and racetrack safety; investigate violations of its rules by issuing and enforcing subpoenas and instituting charges; and, upon instituting charges for violations of the rules, adjudicate its charging decisions through arbitration proceedings constructed by the Authority, under rules written by the Authority, and by an arbitrator selected and trained by the Authority.

*The ADMC Program's strict liability treatment of Metformin*

16.     As part of its legislative mandate, the Authority must develop and issue rules concerning the "list of permitted and prohibited medications, substances, and methods, including allowable limits of permitted medications, substances, and methods." 15 U.S.C.A. § 3055(1)(B).

"[T]he Authority shall issue, by rule in accordance with section 3053 of this title,[1] a description of safety, performance, and anti-doping and medication control rule violations applicable to covered horses and covered persons." 15 U.S.C. § 3057(1).

17.     The Authority did so in part by promulgating anti-doping and medication control rules that form the ADMC Program (HISA Rule Series 3000). *See* 88 Fed. Reg. 5070-5201.

18.     Under 15 U.S.C. 3055(b)(1), when "developing the [ADMC Program]," the Authority must consider that:

> (1) Covered horses should compete only when they are free from the influence of medications, other foreign substances, and methods that affect their performance.
> (2) Covered horses that are injured or unsound should not train or participate in covered races, and the use of medications, other foreign substances, and treatment methods that mask or deaden pain in order to allow injured or unsound horses to train or race should be prohibited.
> (3) Rules, standards, procedures, and protocols regulating medication and treatment methods for covered horses and covered races should be uniform and uniformly administered nationally.
> (4) To the extent consistent with this chapter, consideration should be given to international anti-doping and medication control standards of the International Federation of Horseracing Authorities and the Principles of Veterinary Medical Ethics of the American Veterinary Medical Association.
> (5) The administration of medications and treatment methods to covered horses should be based upon an examination and diagnosis that identifies an issue requiring treatment for which the medication or method represents an appropriate component of treatment.
> (6) The amount of therapeutic medication that a covered horse receives should be the minimum necessary to address the diagnosed health concerns identified during the examination and diagnostic process.
> (7) The welfare of covered horses, the integrity of the sport, and the confidence of the betting public require full disclosure to regulatory authorities regarding the administration of medications and treatments to covered horses.

19.     The ADMC Program distinguishes between Banned Substances and Controlled Substances. *See* HISA Rule 3111(a)(1)-(2). A Banned Substance is "prohibited at all times . . . on the basis of the Agency's determination that medical, veterinary, or other scientific evidence or

---

[1] 15 U.S.C. § 3053 provides for the FTC's "oversight" over the Authority's regulatory proposals.

experience supports their actual or potential (i) ability to enhance the performance of Covered Horses, (ii) masking properties, or (iii) detrimental impact on horse welfare[.]" HISA Rule 3111(a)(1). On the other hand, a Controlled Substance is allowed to be used or administered at certain times but is "prohibited to be present in a Post-Race Sample or Post-Work Sample, except as otherwise specified[.]" *Id.*

20.     Under the ADMC Program, "[i]t is the personal and nondelegable duty of the Responsible Person to ensure that no Banned Substance is present in the body of his . . . Covered Horse(s)." HISA Rule 3212.

21.     A Covered Person "is therefore strictly liable for any Banned Substance . . . found to be present in a Sample collected from his . . . Covered Horse(s)." HISA Rule 3212(a); *see* 15 U.S.C. § 3057(a)(2) (The Authority may impose "strict liability for covered trainers for . . . the presence of a prohibited substance or method in a sample or the use of a prohibited substance or method[.]").

22.     Strict liability is harsh on the Covered Person but the lightest of all burdens for the Authority to prove. "[I]t is not necessary [for the Authority] to demonstrate intent, fault, negligence, or knowing use on the part of the Responsible Person in order to establish that the Responsible Person has committed a Rule 3212 Anti-Doping Rule Violation." HISA Rule 3212.

23.     In other words, because a Banned Substance is "prohibited at all times," there is zero tolerance. No amount of a Banned Substance is permitted—ever, regardless of circumstances. Even the presence of a Banned Substance caused by environmental or inadvertent contamination is not excused, only potentially mitigating the consequences imposed for an ADMC Program violation but not providing a complete defense.

24.     The medication at issue in this case—Metformin—is regulated as a Banned Substance.

25.     Metformin is widely prescribed in the United States to humans for treatment of diabetes. In horses, Metformin may also be used to treat diabetes, but it is more commonly used to control inflammation. Small doses result in trace-level concentrations, cause negligible effects on a horse, and do not positively or negatively impact a horse's competitive performance. As a result, small doses of Metformin do not compromise horseracing integrity or safety.

26.     The Authority's regulation of Metformin as a Banned Substance is head-scratching at best, and unscientific, arbitrary, and capricious at worst. Metformin is not prohibited by either the World Anti-Doping Agency or the  United States Anti-Doping Agency ("USADA"), which both regulate human athletics.

27.     The Authority's CEO and the Chairman of the Authority's board have both acknowledged this lack of scientific evidence. The CEO stated in interviews to horseracing trade publications that the Authority "ha[s] intelligence that suggests that some trainers believe [Metformin] is performance-enhancing, ***whether it is or it isn't***." The Chairman admitted publicly that "there is limited scientific information available regarding the substance's use in horses."

28.     Not just limited scientific information—upon information and belief, there is ***no*** scientific research studying Metformin in horses, much less corroborative scientific research that Metformin is performance-enhancing in horses.

29.     Yet, despite the ADMC Program's requirement that there be "medical, veterinary, or other scientific evidence or experience" supporting Metformin's "actual or potential . . . ability to enhance the performance of Covered Horses," *see* HISA Rule 3111(a)(1), the Authority has

never publicized any such evidence or experience for regulating Metformin as a Banned Substance.

30.     To reiterate, because Metformin is a Banned Substance, the presence of Metformin in a horse's blood or urine sample—at any time, in any amount—is a violation of the ADMC Program and subject to enforcement.

### The Authority's private enforcement through HIWU

31.     HISA permits the Authority to bring ADMC Program enforcement actions in two alternative forums. The Authority may bring an enforcement action in a United States district court for the recovery of monetary and equitable remedies. 15 U.S.C. § 3054(j)(1). Or, the Authority may bring enforcement actions through an agency-friendly administrative resolution process.

32.     An action in federal district court would, of course, include all the protections of the federal judicial system, including adjudication by a Senate-confirmed, lifetime-appointed federal district court judge; pleading standards, motion practice, and access to discovery under the Federal Rules of Civil Procedure; evidentiary rulings under the Federal Rules of Evidence, and— perhaps most importantly—entitlement to a jury trial.

33.     It is no surprise, then, that the Authority has never initiated an enforcement action in federal district court. In every ADMC Program enforcement action brought to date, the Authority has chosen the administrative resolution process.

34.     As required under HISA, the Authority contracted enforcement of the ADMC Program to Drug Free Sport, LLC ("Drug Free Sport"), a private company. 15 U.S.C. § 3054(e)(1)(A),(B). Drug Free Sport conducts enforcement through its specially created division, the Horseracing Integrity and Welfare Unit ("HIWU"). HIWU is yet another private entity within the Authority's federal regulatory structure.

35.    HIWU prosecutes ADMC Program violations, and the Authority may "impose[] a final civil sanction for a violation committed by a covered person pursuant to the rules or standards of the Authority[.]" 15 U.S.C. § 3058(a).

36.    At the first level of the administrative resolution process, an arbitration is held before an arbitrator selected from an Arbitral Body. The Authority and HIWU jointly select and contract with JAMS to supply the pool of arbitrators. *See* HISA Rule 7020(a). There is a minimum of five arbitrators in the pool, all of whom are "appointed by mutual agreement of the Authority and [HIWU]." HISA Rule 7030(a).

37.    It is not hyperbole—but it is remarkable—that HIWU selects the individuals who adjudicate its ADMC Program enforcement actions.

38.    The arbitration is subject to the Arbitration Procedures promulgated in HISA Rule Series 7000.

39.    The Authority constructed the administrative resolution process so that HIWU has the easiest of paths for proving an ADMC Program violation.

40.    Neither the Authority nor HIWU has an obligation to conduct an independent pre-charging or pre-enforcement investigation. For example, the Authority and HIWU are not required to inspect the barn or stall where the Covered Horse was kept prior to collection of the horse's blood or urine samples, conduct DNA testing for confirming the identity of a horse's sample, interview witnesses, investigate alternative sources, subpoena video surveillance or recordings, or collect or disclose exculpatory evidence.

41.    During the arbitration, there is no entitlement to documents or information, unlike in federal district court. "Requests for discovery and wide-ranging or otherwise disproportionate document requests shall not be permitted." HISA Rule 7260(b); 88 Fed. Reg., *Self-Regulatory*

*Organization's Summary of Comments Received Pre-Submission and Its Responses to Those Comments* (same).

42.    "[D]ocument production requests ***may*** be permitted," but even these are subject to the discretion of the arbitrator. HISA Rule 7260(b). This means that if the arbitrator determines that document requests "do not fit in the circumstances," there is no procedural document-or information-gathering mechanism at all. *See id.*

43.    An arbitrator may issue "subpoenas for witnesses, documents, information, or other evidence upon the request of any party," but these are also subject to the arbitrator's sole discretion, and the arbitrators must "keep in mind the expedited nature of the proceedings . . . " HISA Rule 7260(f).

44.    HISA Rule 7260(f) takes interrogatories and depositions completely off the table. "[T]he arbitrator(s) . . . shall not issue a subpoena for a deposition, because depositions (along with formal written discovery in civil litigation) are not in keeping with the expedited nature of the Arbitration Procedures." *Id.*

45.    Upon information and belief, arbitrators have routinely denied basic discovery requests in ADMC Program enforcement actions that would have been available under the Federal Rules of Civil Procedure. In this case, for example, the arbitrator denied Wong's request for limited document requests, even though HISA Rule 7260(b) permitted them.

46.    The lack of discovery tools necessary to put on a defense is exacerbated by HIWU's lopsided burden of proof.

47.    HIWU has "the burden of establishing that a violation . . . has occurred to the comfortable satisfaction of the [arbitrator], bearing in mind the seriousness of the allegation that is made." HISA Rule 3121(a). "This standard of proof in all cases is greater than a mere balance

of probability (*i.e.*, preponderance of the evidence) but less than clear and convincing evidence or proof beyond a reasonable doubt." *Id.*

48.     HIWU must prove a HISA Rule 3212 violation, *i.e.*, the presence of a Banned Substance, through scientific analysis and testing of a horse's blood and/or urine samples as conducted by laboratories selected by the Authority. *See* HISA Rule 3122.

49.     The laboratories' scientific analysis and testing are subject to the Equine Standards for Laboratories and Accreditation promulgated in HISA Rule Series 6000.

50.     These "Laboratory Standards" carry the force of federal regulations, *see* Federal Register/Vol. 88, and are binding on the Authority and the FTC.

51.     In theory, the Laboratory Standards are meant as scientific safeguards for ensuring authenticity and minimum reliability of a laboratory's analysis of Samples. *See* 15 U.S.C. § 3055(4)(D). But as explained below, the Laboratory Standards are not strictly followed and most violations of them are determined to not matter.

52.     The HISA Rules require that a horse's blood and urine samples are collected for scientific testing and analysis. *See generally* HISA Rule Series 5000. At the time of collection, A Samples and B Samples of blood and urine are collected in blood tubes and urine containers, respectively. Sample collection is subject to the Equine Standards for Testing and Investigation in HISA Rule Series 5000.

53.     A Responsible Person may choose to waive analysis of the B Sample, which allows HIWU to prove a Rule 3212 violation by demonstrating merely "the presence of a Banned Substance . . . in the Covered Horse's A Sample . . ." HISA Rule 3212(b)(1).

54.    However, where the B Sample is analyzed, HIWU is deemed to have established "sufficient proof" of a HISA Rule 3212 violation by demonstrating that the "B Sample confirms the presence of the Banned Substance . . . found in the A Sample[.]" HISA Rule 3212(b)(2).

55.    If the B Sample confirms the A Sample, the Responsible Person **shall** be Provisionally Suspended upon notification of the B Sample confirmation. HISA Rule 3247(a)(1).

56.    The Authority's selected laboratories are "presumed to have conducted sample analysis and custodial procedures in accordance with the Laboratory Standards [in HISA Rule Series 6000]." HISA Rule 3122(c).

57.    A Responsible Person may only "rebut this presumption by establishing that a departure from the Laboratory Standards occurred that could reasonably have caused the Adverse Analytical Finding or other factual basis for any other violation asserted." *Id*. Where the presumption is rebutted, "the [Authority] shall have the burden of establishing that such departure did not cause the Adverse Analytical Finding or other factual basis for the violation asserted." *Id.*

58.    Cumulatively, HISA Rule 3122 establishes a "burden-shifting framework" that (1) presumes the validity of the A Sample and B Sample results, (2) requires the Responsible Person to prove that a laboratory's departure from the HISA Rules could have caused the detection of the Banned Substance (without access to discovery), and, where such a departure is proved, (3) permits HIWU to nonetheless prove its case by showing that the laboratory's departure did not result in the detection of the Banned Substance. In practice, arbitrators apply this framework to nullify the HISA Rules that do not touch upon a laboratory's testing of Samples—like chain of custody and laboratory certification requirements.

59.    To give enforcement its teeth, HISA directs the Authority to "develop a list of civil penalties with respect to the enforcement of rules for covered persons and covered horseraces

under its jurisdiction." 15 U.S.C. § 3054(i). And how sharp the teeth are—even for a first-time violation.

60.    Where HIWU has proved a HISA Rule 3212 violation, all the following consequences must be imposed: (1) disqualification of the horse's results, (2) forfeiture of the purse, (3) two-year period of ineligibility, *i.e.*, suspension, and (4) a fine of up to $25,000. *See* HISA Rules 3223 & 1020. Additionally, the arbitrator may require the Responsible Person to pay some or all of HIWU's share of arbitration costs. HISA Rule 3223.

61.    A Responsible Person may avoid some, but not all, of the consequences if he proves he lacked any fault:

> If a Covered Person establishes in an individual case that he or she bears No Fault or Negligence for the Anti-Doping Rule Violation(s) charged, the otherwise applicable period of Ineligibility and other Consequences for such Covered Person shall be eliminated (except for those set out in Rule 3221(a)[2] and Rule 3620).[3] When the violation is of Rule 3212 (presence of a Banned Substance), the Covered Person must also establish how the Banned Substance entered the Covered Horse's system as a pre-condition to application of this Rule 3224(a)."

HISA Rule 3224(a).

62.    If the Responsible Person proves he lacked "Significant Fault or Negligence," the arbitrator has the discretion, but is not obligated, to reduce the consequences. HISA Rule 3225.

63.    But without any requirement that the Authority conduct a pre-enforcement investigation and in the absence of the procedural protections and discovery tools that exist in federal district court, a Responsible Person is hard pressed to prove "No Fault or Negligence" or "No Significant Fault or Negligence."

---

[2] HISA Rule 3221(a) requires an automatic disqualification of the Covered Horse's race results.
[3] HISA Rule 3620 requires that a violation be publicly disclosed.

64.     The arbitrator's decision "shall be the final decision or civil sanction of the Authority" but is subject to review by an Administrative Law Judge. 15 U.S.C. § 3055(4)(B). This is the second level of HISA's administrative resolution process.

65.     The ALJ's decision is subject to discretionary review by the FTC. *Id.* Review by the FTC is the third level of HISA's administrative resolution process.

66.     After the FTC's review, or the FTC's decision to not grant discretionary review, a Responsible Person may appeal under the Administrative Procedure Act. *See* 15 U.S.C. § 3058(c)(2)(B) ("If an application for review under subparagraph (A) is denied, the decision of the administrative law judge shall constitute the decision of the Commission without further proceedings.").

67.     HISA delegates to the Authority breathtakingly broad and coercive federal regulatory power over virtually all horseracing activities in the United States. But HISA's three-level administrative resolution process for ADMC Program violations insulates the Authority and HIWU and leaves them unaccountable to any political actor. *See* 15 U.S.C. § 3052(a); *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 107 F.4th 415, 428-31 (5th Cir. 2024).

68.     HISA attempted to justify this unconstitutional delegation of federal regulatory power by purporting to provide oversight by the FTC. However, when it comes to ADMC enforcement decisions, the FTC acts as a rubber stamp and lacks any power to review an enforcement decision until ***after*** enforcement is complete and penalties are imposed. *See generally* 15 U.S.C. § 3058. The Authority and HIWU are therefore unchecked in their enforcement against a Responsible Person—even where they do so unconstitutionally—unless and until the FTC exercises its discretion to grant review.

**B.**     **The Authority's enforcement of Metformin cases has been unequal.**

69.     The Authority is a federal regulatory Goliath, towering over "all trainers, owners, breeders, jockeys, racetracks, veterinarians, persons (legal and natural) licensed by a State racing commission and the agents, assigns, and employees of such persons and other horse support personnel who are engaged in the care, training, or racing of covered horses." 15 U.S.C. § 3051(6).

70.     But the Authority has not regulated all Covered Persons equally, particularly in Metformin cases.

71.     In October 2023, after the A Sample and B Sample testing and analysis in Wong's case, the Authority—without the FTC's approval—introduced a Harmonized Internal Screening Limit ("HISL") for Metformin. Going forward, all the HIWU-selected laboratories were required to use the HISL for determining whether to proceed with confirmatory testing and analysis. Samples that met or exceeded the HISL proceeded to confirmatory testing and analysis, while samples that fell below the HISL did not. The Horse's Samples were not re-screened or re-tested, and, upon information and belief, HIWU's future enforcement decisions in Metformin cases were based on whether testing confirmed the presence of Metformin after the sample had been screened under the HISL.

72.     On June 4, 2024, while Wong's petition for review by the FTC was pending, the Authority announced a policy change, effective immediately, to defer all provisional suspensions associated with positive test results for Metformin.

73.     The Authority expressed it "feels that further expert analysis on the topic is necessary to determine if any refinement of [the Authority's] rules is appropriate," implying that the Authority lacked adequate expert analysis for initially determining Metformin to be a Banned Substance.

74.    As part of the policy change, the Authority and HIWU directed the Racing Medication & Testing Consortium's Scientific Advisory Committee ("RMTC") to conduct a review of the available science relating to Metformin. The Authority stated that, following the RMTC's review and conclusions, it will determine whether any rule changes regarding Metformin should be submitted to the FTC for approval. The RMTC's review was expected "to take a few months," but has lasted much longer and is still ongoing.

75.    One beneficiary of the policy change was trainer and horseracing industry insider George Weaver, whose provisional suspension for a Metformin positive test result was lifted.

76.    Despite his case not being finally adjudicated at the time of the policy change, Wong's suspension was not lifted. The Authority has been emphatic that it will not lift Wong's suspension.

77.    The reason why is no wonder. Unlike George Weaver, Wong did not serve on the Authority's Advisory Board and is not among the horseracing industry's insiders.

78.    The point is—had Wong's alleged violation occurred after June 4, 2024, he, like George Weaver, never would have been suspended.

**C.    <u>Wong fully exhausted his administrative remedies and seeks judicial review.</u>**

79.    HISA's unconstitutionality is unmistakable and has resulted in illegal and selective enforcement by the Authority. But in addition to those issues, this case is also about the Authority's specific enforcement against Wong.

80.    Wong is a horse trainer and is subject to HISA as a "Covered Person."

81.    Since he was nine years old, Wong dreamed of working with horses.

82.    Wong began working at racetracks in high school when he was just sixteen years old. He worked his way up from walker, to groom, and eventually to trainer.

83.    Wong apprenticed under several distinguished trainers and earned his training license in 2014.

84.    Wong's success as a trainer allowed Wong to expand his training barn to 150 horses.

85.    Throughout his career, clients, colleagues, and industry participants observed that Wong "puts the horse's safety first."

86.    Of his horses' more-than-5,000 race starts, Wong took first place in 1,200 races and finished in the money (*i.e.*, "win" - first, "place" - second, or "show" - third) in approximately 3,000 races—a 60% percentage.

87.    Within the industry, Wong was highly regarded and in demand; that is, until the Authority's unconstitutional enforcement against him.

88.    On June 1, 2023, Heaven and Earth (the "Horse"), a horse trained by Wong, finished first in Race 7 at Horseshoe Indianapolis ("Horseshoe") in Shelbyville, Indiana.

89.    At the time of the subject race, the Horse, a filly, was two years old. She is now three years old.

90.    The Horse had shipped-in to Horseshoe earlier on June 1, 2023, after being transported from her home barn in Kentucky.

91.    After shipping in, the Horse occupied a designated stall in the receiving barn at Horseshoe.

92.    As the winner of the subject race, the Horse earned a purse of $21,600. As is standard in the horseracing industry, ten percent of purse winnings are paid to the trainer and ten percent of purse winnings are paid to the jockey.

93.    As required under the ADMC Program, due to winning the subject race, the Horse was required to undergo blood and urine sample collection.

94.    The sample collection occurred at the test barn at Horseshoe immediately following the subject race. A sample collection officer collected the Horse's blood sample (#B100231018) and urine sample (#U100231018) (the "Samples").

95.    The Samples were kept at Horseshoe overnight and were shipped to Industrial Laboratories ("Industrial") on June 2, 2024, for the A Sample testing and analysis.

96.    The Authority has not introduced or developed any evidence concerning the post-collection storage of the Samples, including how and where the Samples were held in custody, or who had access to them. Indeed, the conditions of how the Samples were stored and held in custody following their collection on June 1 until their transportation to Industrial sometime on June 2, 2024, are unknown.

97.    Industrial received the Samples on June 3, 2023. (HISA Appeal Book ("HAB"), attached as **Exhibit A**, 44).

98.    Between June 5 and June 22, 2024, Industrial conducted testing and analysis on the A Samples of blood and urine. (*Id.*)

99.    Industrial detected the presence of Metformin in the A Samples of blood and urine and issued an Adverse Analytical Finding ("AAF") due to the detected presence of Metformin. (*Id.* at 42).

100.    HIWU adopted the AAF as the basis for prosecuting Wong. *See id.*

101.    On July 1, 2023, HIWU notified Wong that Industrial had issued an AAF due to the detection of Metformin in the A Samples. (*Id.*).

102.    This was the first time that Wong learned of his alleged violation of the ADMC Program, even though a month had passed since the subject race.

103.    On July 2, 2023, the Authority provisionally suspended Wong, which barred Wong from conducting training activities and participating in any Covered Horserace. (*Id.* at 42).

104.    Wong had 150 horses in his care at the time and was forced to, basically overnight, transfer the horses to other trainers.

105.    One of the horses that Wong had to transfer was Epic Ride, who competed in the 2024 Kentucky Derby under the new trainer.

106.    On July 3, 2023, Wong notified the Authority to request that the Horse's B Samples be sent to a second laboratory for the B Sample testing, exercising his right under HISA Rule 3246. (*Id.*).

107.    A week later, on July 10, 2023, Industrial shipped the B Sample of urine to the University of Illinois at Chicago Analytical Forensic Toxicology Laboratory ("UIC") for B Sample testing and analysis. (*Id.* at 44).

108.    UIC's records show discrepancies, with one record stating the B Sample was received on July 11, 2023, and another on July 26, 2023.

109.    More than a week after that, on July 18, 2023, Industrial shipped the B Sample of blood to UIC for testing and analysis. (*Id.*).

110.    UIC acknowledged receiving the B Sample of blood on July 19, 2023, but it did not check in the B Sample of blood until a week later—on July 26, 2023.

111.    UIC did not provide any shipping tracking information for its receipt of the B Samples of urine or blood.

112.    Between July 28 and August 10, 2024, UIC conducted testing and analysis on the B Samples of blood and urine. (*Id.*)

113.    Pending the B Sample results, the Authority lifted Wong's provisional suspension between July 28 and August 10, 2024. (*Id.* at 57).

114.    Even though Wong's provisional suspension was temporarily lifted, Wong had already been suspended 26 days—prior to any B Sample analysis or Further Analysis being done, and prior to confirmation of the A Sample test results.

115.    On August 10, 2023, UIC reported the detection of Metformin in the B Samples of blood and urine. (*Id.*).

116.    Following the B Sample results, the Authority reinstated Wong's provisional suspension effective August 10, 2023. (*Id.*).

117.    Remarkably, after its B Sample testing and analysis in this case, UIC's laboratory accreditation with the RMTC was suspended. Upon information and belief, RMTC considered UIC's violations of the HISA Rules in this case in deciding to suspend UIC's accreditation.

118.    On August 10, 2023, HIWU issued a charge letter to Wong, notifying him that HIWU was charging him with an ADMC Program violation for the presence of Metformin in the Horse's Samples. (*Id.* at 804).

119.    The charge letter advised Wong that he had one week to (1) admit the ADMC Program violation and accept, dispute, or seek to mitigate HIWU's proposed consequences or (2) deny the ADMC Program violation and dispute HIWU's proposed consequences at a "hearing in accordance with ADMC Program Rule 3261 (Protocol) and Arbitration Procedures." (*Id.* at 805).

120.    HIWU did not advise Wong of any option to have HIWU's enforcement brought in federal district court.

121.    HIWU did not advise Wong that, if he elected to dispute the ADMC Program violation at a hearing, that HIWU would later argue that the arbitrator, ALJ, and FTC lacked jurisdiction to hear Wong's legal challenges, such as Due Process claims.[4]

122.    Wong chose to dispute the ADMC Program violation at a hearing before an arbitrator.

123.    Neither the Authority nor HIWU took any steps to prosecute the ADMC Program violation in federal district court.

124.    On August 10, 2023, the HIWU-selected arbitrator, Nancy Holtz, issued a notice scheduling the arbitration hearing for September 25, 2023. (HAB at 164). The hearing was subsequently rescheduled for January 9 and 10, 2024.

125.    On November 15, 2023, the arbitrator issued an amended order setting pre-hearing deadlines. Even though HIWU had the burden of proof, Wong was ordered to file his pre-hearing brief, witness list, and exhibit list first, by December 1, 2023. HIWU was permitted to file its pre-hearing brief, witness list, and exhibit list by December 18, 2023, forcing Wong to develop his case in chief before knowing HIWU's case. The parties were to file their motions *in limine* by December 29, 2023. (*Id.* at 179-82).

126.    Wong timely filed his pre-hearing brief, identifying numerous errors by Industrial and UIC in the testing and analysis of the Samples and arguing that the errors rendered the

---

[4] In Wong's case and in other cases, HIWU argued that the arbitrator, ALJ, and FTC lack jurisdiction to adjudicate legal issues, such as federal law applying Due Process. For example, here, the arbitrator accepted HIWU's argument in opposition to Wong's document requests that "many documents sought [by Wong] appear to be in support of an anticipated collateral attack on classifications and other determinations over which I have no jurisdiction to amend, alter or vacate." (HAB at 196). Purportedly for the same reason, neither the arbitrator, ALJ, nor FTC addressed Wong's claim that federal law required the Authority and its selected laboratories to strictly adhere to the HISA Rules. At all times, Wong was made to believe that challenges to HIWU's enforcement that were based on legal issues must be brought in federal district court after final resolution of the administrative resolution process.

laboratories' analyses inadmissible and unreliable. (12/01/2023 Respondent's Pre-Hearing Brief, attached as **Exhibit B**, 19-23).

127.     On December 15, 2023, Wong filed a motion requesting that HIWU produce certain documents. (HAB at 2007). Among other documents, Wong sought:

> 13. Documents concerning the drug testing instrumentation in use by the labs that performed testing on the samples at issue in this arbitration.

> 14. Documents reflecting that the labs HIWU works with are operating in accordance with RMTC Guidelines and requirements for accreditation.

> 15. Documents reflecting the lab accreditation status for the two laboratories involved with the testing of Jonathan Wong's samples (Industrial Laboratories and University of Illinois at Chicago Analytical Forensic Testing Laboratory.).

> 16. Documents reflecting the participation by Industrial Laboratories and University of Illinois at Chicago Forensic Laboratory in the Agency External Quality Assessment Scheme, including blind sample testing results since May 2023.

> 17. Documents submitted to HISA/ADMC by Industrial Laboratories and University of Illinois at Chicago Forensic Laboratory listing their Validated Initial Testing Procedures and Confirmation procedures, and Limits of Detection and Estimates of Measurement Uncertainty for Metformin.

> 18. Documents concerning compliance with Rules 5310, 5500, 5520, 6303, and 6312 in the handling of the samples in Mr. Wong's case.

> 19. Documents reflecting any investigation of possible contamination in the sample collection facility (i.e., the "Test Barn") at Horseshoe Indianapolis.

(*Id.* at 301-302).

128.     Despite explicitly acknowledging the stakes of HIWU's enforcement against Wong, the arbitrator denied Wong's motion, concluding, "This arbitration will not be converted into a piece of litigation." (*Id.* at 305). The arbitrator directed Wong to narrow his document requests.

129.    Following the arbitrator's denial of his document requests, Wong attempted to obtain documents voluntarily from Industrial and UIC. He sent letters requesting that the laboratories provide documents about their process for handling complaints.

130.    HIWU obstructed Wong's attempts to obtain documents. Through its counsel, HIWU instructed the laboratories "to ignore" Wong's requests for documents and, in a letter to Wong, stated that Wong "ha[s] *no right* to obtain documentation directly from the Testing Laboratories outside the confines of the arbitration, and in the absence of an order from the Arbitrator authorizing the requested document production." According to HIWU, even a voluntary production of documents by the laboratories is prohibited by the HISA Rules and may only occur when ordered by the arbitrator.

131.    Based on Wong's identification of errors by Industrial and UIC, HIWU filed a motion requesting that the Kenneth L. Maddy Equine Analytical Chemistry Laboratory at the University of California, Davis ("UC Davis"), conduct Further Analysis of the B Sample. (*Id.* at 1919-25).

132.    HIWU filed a motion for Further Analysis under HISA Rule 3138(b). At the time of HIWU's motion, the term "Further Analysis," which HIWU later proposed to redefine, meant "additional analysis conducted by a Laboratory on an A Sample or a B Sample after *it* has reported an analytical result for that A Sample or that B Sample." HISA Rule 1020 (emphasis added).

133.    Wong objected to Further Analysis on several grounds, including because UC Davis did not conduct the A Sample or B Sample analysis.

134.    In violation of HISA Rule 3138(b), and without any legal analysis or reasoning, the arbitrator granted HIWU's motion for Further Analysis by UC Davis. (*Id.* at 184).

135.    UC Davis performed Further Analysis of the A Sample of blood and the B Sample of urine. UC Davis did not analyze the A Sample of urine or the B Sample of blood.

136.    To reiterate, there was no Further Analysis of the B Sample of blood, meaning there was no Further Analysis of the B Sample of blood that confirmed the A Sample analysis of blood.

137.    UC Davis reported a detection of the presence of Metformin in the B Sample of urine. (*Id.* at 43).

138.    On January 2, 2024, Wong filed amended document requests. Following the arbitrator's instruction, Wong narrowed his document requests to just the following:

9. Documents concerning compliance with Rules 5310, 5500, 5520, 6303, and 6312[5] in the handling of the samples in Mr. Wong's case . . .

10. Documents reflecting any investigation of possible contamination in the sample collection facility (i.e., the "Test Barn") at Horseshoe Indianapolis . . .

13. All documents the Kenneth L. Maddy Equine Analytical Chemistry Laboratory at the University of California at Davis received with the samples from Heaven and Earth sent to it.

(*Id.* at 2035-2042).

139.    The arbitrator denied Wong's narrowed document requests. (*Id.* at 195-97).

140.    During the course of HIWU's enforcement, Wong made multiple requests for DNA testing. Wong requested DNA testing at the outset of the enforcement, which HIWU denied, stating, "There is no basis for DNA testing to be conducted at this junction." (*Id.* at 2022). The arbitrator denied Wong's subsequent request for DNA testing. Had DNA testing been granted, it would have definitively resolved the identity issue of whether the Samples analyzed by Industrial, UIC, and UC Davis were the same Samples collected from the Horse.

---

[5] These HISA Rules were central to Wong's arguments that there was no evidence of the Samples' post-collection, pre-analysis chain of custody and that HIWU and its selected laboratories violated the HISA Rules.

141.    Wong lodged substantiated attacks against Industrial's and UIC's testing and analyses and consistently disputed the laboratories' purported detection of Metformin in the Samples. There was an adequate basis for DNA testing.

142.    On January 4, 2024, Wong filed a motion to dismiss HIWU's charge, raising many of the arguments in his pre-hearing brief and objection to Further Analysis. (*Id.* at 2062-88).

143.    The arbitrator denied the motion because "the issues raised [were] more properly reserved for the hearing on the merits." (*Id.* at 199).

144.    Prior to the hearing, Wong sought leave to file a witness statement for Luis Gerardo Hernandez Perez ("Perez"), a former groom who was prescribed Metformin and who had physical contact with the Horse on the day of the subject race.

145.    Wong intended to identify Perez as a possible explanation for the Metformin positive, at least to demonstrate "No Fault" or "No Significant Fault" on the part of Wong.

146.    According to his sworn statement, Perez cared for the Horse for the seven months leading up to the day of the subject. Perez was prescribed Metformin. He stated he routinely urinated in the Horse's stall, regularly failing to wash his hands prior to having physical contact with the Horse. (*Id.* at 84).

147.    Wong intended for Perez to testify in person at the arbitration hearing. But in its opposition to Perez's sworn statement, HIWU threatened Perez's immigration status. HIWU argued that if Perez's statement were allowed to be filed, Perez should be required to testify in person, be accompanied by a court-certified Spanish-English interpreter, and be required to provide a passport and the visa under which he worked for Wong—none of which HIWU demanded for any other witness.

148.    The arbitration hearing was held on January 9 and 10, 2024. (*Id.* at 1847-1840).

149.    At the start of the hearing, Wong renewed his request that HIWU's charge be dismissed and objected to HIWU's introduction of certain evidence, which the arbitrator overruled.

150.    Perez did not testify at the hearing.

151.    The arbitrator issued a final decision on January 29, 2024, and issued a corrected final decision on February 4, 2024. (*Id.* at 2127-76).

152.    In the final decision, the arbitrator concluded that HIWU carried its burden of proving that Wong violated HISA Rule 3212 due to the presence of Metformin.

153.    Because Perez did not appear at the hearing, the arbitrator discounted his sworn statement and found that Wong failed to provide any mitigating evidence proving the source of the Metformin. (*Id.* at 84-85).

154.    The arbitrator found that Wong was strictly liable and did not satisfy HISA Rule 3224(a)'s standard for proving lack of Fault or Negligence. (*Id.* at 81).

155.    The arbitrator imposed against Wong the civil sanctions of a two-year suspension, disgorgement of the Horse's $21,600 purse winnings, and a $25,000 fine, plus $8,000 of HIWU's share of the "adjudication costs." (*Id.* at 71).

156.    The Authority filed the arbitrator's decision and imposition of civil sanctions with the FTC, causing the civil sanctions to take effect.

157.    On February 14, 2024, Wong filed an appeal for review by the ALJ. (*Id.* at 33-37); *see* 5 U.S.C. § 3058(b); 16 C.F.R. § 1.146(b) (providing for *de novo* review).

158.    On appeal, Wong argued that the arbitrator erred in several respects.

159.    *First*, Wong argued that the arbitrator erred by ignoring HISA Rule 5510's requirements for documentation that the Samples were properly stored and held in custody prior to being shipped to Industrial. Wong had sought dismissal of HIWU's charge—at multiple

stages—based on the absence of HISA Rule 5510 evidence. Indeed, there was no evidence establishing the Authority's compliance with HISA Rule 5510.

160.    ***Second***, Wong argued that the arbitrator erred by finding that the HISA Rules regarding chain of custody were met because "all of the necessary information was recorded somewhere in each of the laboratories' records and that there were no gaps in the chain of custody." (HAB at 77). The arbitrator's ruling could not be squared with the arbitrator's other findings that "the present mode of record keeping at the laboratories is inadequate" and UIC's "documentation would benefit from some improvements." (*Id.*).

161.    ***Third***, Wong argued that the arbitrator erred in finding that UIC complied with HISA Rule 6315(b). The "technical review" conducted by UIC's Marc Benoit and Benoit's typed initials in UIC's documentation did not meet HISA ule 6315(b)'s requirement that two certifying scientists conduct an independent review of a laboratory's analysis and attest to the validity of the test results.

162.    ***Fourth***, Wong argued that the arbitrator erred in determining that the HISA Rule violations proved by Wong—regardless of their nature—were subject to HISA Rule 3122(d)'s burden-shifting framework. The arbitrator's overly broad view of HISA Rule 3122(d) was incongruent with Due Process and *quid pro quo* fairness.

163.    ***Fifth***, Wong argued that the arbitrator erred in granting HIWU's motion for Further Analysis. HIWU's proposed changes to HISA Rule 1010 confirmed that Further Analysis did not include retesting by a laboratory that did not conduct the A Sample or B Sample analysis.

164.    On April 22, 2024, the ALJ affirmed the arbitrator's final decision and imposition of civil sanctions.

165.    On May 22, 2024, Wong timely filed a petition for review by the FTC. *See* 15 U.S.C. § 3058(b); 16 C.F.R. § 1.147(c) (providing for *de novo* review).

166.    Wong sought reversal of the ALJ's affirmance of the arbitrator's decision, arguing that the ALJ erred in multiple respects.

167.    *First*, Wong argued that the ALJ's decision was erroneous because the ALJ did not apply the HISA Rules' evidentiary requirements.

168.    The ALJ did not address HISA Rule 7250, which mandates that HIWU "present evidence to support its charge." The ALJ did not determine the "admissibility, relevance, and materiality of" the laboratories' test results under HISA Rule 7260(d) or the impact that the laboratories' HISA Rule violations had on the admissibility or weight of the test results as evidence. He did not analyze Federal Rule of Evidence 901, which "may be used for guidance" under HISA Rule 7260(d), requiring that HIWU "account[] for the sample's handling from the time it was first collected until the time it was analyzed." *See* 77 A.L.R.5th 201.

169.    *Second*, Wong argued that, despite concluding that HISA Rules 5510(b), 6305(b)(1), and 6315(b) were violated, the ALJ failed to apply Due Process requirements that "agencies [strictly] adhere to their own rules" and "not violate their own rules . . ." *United Space All., LLC v. Solis,* 824 F. Supp. 2d 68, 82 (D.D.C. 2011) (internal citations and quotation marks omitted).

170.    Regarding Rule 5510(b), the ALJ agreed that HIWU failed to establish chain of custody, holding that "[t]he Authority's failure to do so warrants a conclusion that a departure of HISA Rule 5510(b) occurred." (ALJ Decision, attached as **Exhibit 3**, 8).

171.    Nevertheless, the ALJ excused the violation by applying HISA Rule 3122(d)'s unconstitutional burden-shifting framework and faulted Wong for failing to "proffer expert

opinion as to whether the failure to" comply with the chain of custody requirements for refrigeration and freezing "could reasonably have led to an incorrect finding of the presence of Metformin." (*Id.* at 11).

172.    The ALJ implicitly held that Wong needed to prove that the Samples were not from the Horse, unlawfully imposing a presumption of guilt and the burden of proof on Wong. Yet, the ALJ ignored that the arbitrator denied Wong's request for DNA testing, which would have been Wong's only mechanism for proving that identify of the Samples.

173.    The ALJ's conclusion that HISA Rule 3122's burden-shifting framework afforded Due Process was inherently contradictory. HISA Rule 3122 shifted the burden to Wong—the charged party—and required him to prove causation without the HISA Rules providing sufficient access to discovery.

174.    Regarding HISA Rule 6305(b)(1), the ALJ agreed with Wong that UIC's failure to correctly decant the B Sample of urine "constitute[d] a departure from [HISA] Rule 6305."

175.    But as with the violation of HISA Rule 5510, the ALJ applied HISA Rule 3122(d)'s burden-shifting framework and held that Wong had not established that UIC's failure to correctly decant the B Sample of urine could reasonably have caused the AAF.

176.    Regarding HISA Rule 6315(b), the ALJ agreed with Wong in part, holding that the arbitrator erred because Benoit reviewed UIC's analysis after UIC had already certified its analytical results.

177.    However, the ALJ incorrectly rejected Wong's argument that UIC failed to perform an "independent" review. The ALJ misconstrued Wong's argument as suggesting that only "external scientists" may perform independent reviews, when Wong instead argued that UIC's director was not independent because he performed portions of the testing that he then sought to

review as a certifying scientist. The ALJ ignored that UIC's personnel who were not involved in the B Sample testing could have served as certifying scientists and conducted the independent review required by HISA Rule 6315(b).

178.    **Third**, rather than address the merits of Wong's valid argument that Further Analysis violated HISA Rule 3138(b), the ALJ rejected Wong's argument for incorrect procedural reasons.

179.    Despite 16 C.F.R. § 1.147(b)(4)'s requirement that the FTC grant or deny a petition for review "as expeditiously as possible," the FTC did not resolve Wong's petition until August 28, 2024.

180.    The FTC resolved Wong's petition by denying review (the "Final Decision").

181.    Wong now seeks judicial review of the Final Decision in this Court.

182.    HISA does not provide for judicial review, but the FTC's Final Decision constitutes the FTC's final agency action. 15 U.S.C. § 3058(b)(3)(B),(c)(2)(B).

183.    The Final Decision is a final agency action that is reviewable under the Administrative Procedure Act ("APA"). 5 U.S.C. § 702.

184.    Wong has exhausted all administrative remedies available to him.

**D.    <u>Recent judicial decisions make clear that HISA and the HISA Rules are unconstitutional.</u>**

185.    While Wong's case was winding through HISA's administrative resolution process, two relevant cases were decided.

186.    In *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 107 F.4th 415 (5th Cir. 2024), the Fifth Circuit Court of Appeals held that HISA's delegation of federal regulatory-enforcement power to the Authority is unconstitutional. Based on its ruling, the Fifth Circuit enjoined enforcement of HISA in Louisiana, Oklahoma, and Texas.

187.    In *S.E.C. v. Jarkesey*, 255 S. Ct. 2217 (2024), the United States Supreme Court held that the Seventh Amendment's right to a jury trial applied to enforcement of the Security and Exchange Commission's anti-fraud regulations. Under the Court's ruling, an agency's enforcement that could result in civil monetary penalties must be brought in an Article III court.

188.    These cases are the bases of two of Wong's causes of action.

**E.    <u>Wong is suffering, and will continue to suffer, irreparable harm.</u>**

189.    As a result of the arbitrator's decision, which the ALJ affirmed and the FTC declined to review, Wong has served nearly 15 months of a two-year suspension. Wong is barred from participating in HISA-regulated training activities and Covered Horseraces in every state outside the Fifth Circuit.

190.    The suspension forced Wong to move to Louisiana, where he is permitted to race, but where he is not entitled to all the training and racing benefits he was provided prior to his suspension.

191.    For example, a spokesperson for Churchill Downs, Inc. ("CDI"), which owns Louisiana Fair Grounds racetrack, stated, "***Due to his summary suspension from HIWU***, and although [Wong] is considered in good standing by the Louisiana Racing Commission, [he] is not currently allocated stalls at Fair Grounds or other CDI-owned racetracks . . ." (emphasis added). Another representative from Fair Grounds had previously confirmed to Wong that "[Wong is] not eligible for stalls at CDI under the current circumstances[.]" Upon information and belief, the only reason that Wong is being denied stalls at Fair Grounds—even though HISA is enjoined in Louisiana—is because of the suspension imposed against him under HISA.

192.    The benefits of having stalls at the track are numerous. Having stalls enables a trainer to train the horse on the surface on which the horse will race, as opposed to shipping in the

horse on the day of the race. Shipping in a horse carries risks, including that the horse will inadvertently come into contact with a Banned Substance in the receiving barn. Shipping in a horse to the receiving barn risks the horse becoming nervous or anxious about a new environment, which can impact day-of race performance, whereas having stalls at the track allows the horse to settle into an environment in the few days prior to a race.

193.    As a result of his suspension, Wong has been denied once-in-a-lifetime racing opportunities involving horses that he previously trained and would have continued to train but for the suspension, training income, and racing winnings.

194.    As represented below, the loss in earnings has been precipitous since Wong's provisional suspension took effect.



Equibase, "Trainer Profile | Jonathan Wong," https://www.equibase.com/profiles/Results.cfm?type=People&searchType=T&eID=952853 (last visited October 12, 2024).

195.     In addition to lost once-in-a-lifetime racing opportunities, training income, and racing winnings, Wong has lost customers, goodwill, and business. The imposition of the provisional suspension required Wong to transfer horses out of his care almost overnight. Those horses' owners are previous clients that Wong lost because their horses are being trained by other trainers.

196.     At least one of Wong's former clients holds Wong in low regard. That former client, who was Wong's main client at the time, had been providing housing for Wong and his family. The former client kicked Wong and his family out of the house because of the provisional suspension.

197.     The economic value of the losses of once-in-a-lifetime racing opportunities, training income, racing winnings, customers, goodwill, and business are difficult—if not impossible—to quantify. The losses are irreparable in nature.

198.     Unless Defendants are enjoined from their continued enforcement of Wong's suspension, Wong will continue to suffer irreparable harm.

## IV.     CAUSES OF ACTION

### COUNT I
**Appeal of Final Decision – Administrative Procedural Act –** *Accardi* **Doctrine**
**(HISA Rule 5510(b) – Pre-Analysis Chain of Custody)**

199.     Wong adopts each of the above averments as if restated in full.

200.     A "reviewing court shall . . . hold unlawful and set aside agency action . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" and/or "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(A)-(B).

201.     The FTC is required to comply with the HISA Rules. *See United States ex rel. Accardi v. Shaugnessy*, 347 U.S. 260, 268 (1954).

202.    The FTC, through the ALJ, violated HISA Rule 7260(d) by failing to "determine the admissibility, relevance, and materiality of the evidence offered[.]"

203.    Specifically, the FTC, through the ALJ, failed to determine the "admissibility, relevance, and materiality" of the A Sample, B Sample, and Further Analysis test results offered by HIWU against Wong based on their lack of the chain of custody evidence required by HISA Rule 5510(b).

204.    HISA Rule 5510(b) imposes storage, custody, and recordkeeping requirements that are intended to ensure the identity and integrity of blood and urine samples prior to their transportation to the A Sample laboratory for analysis.

205.    In turn, HISA Rule 5510(b) goes to authentication of the Samples and, under HISA Rule 7260(d), to the admissibility of test results analyzing the samples. *Cf. United States v. Doe*, 465 U.S. 605, 614 (1984) ("[I]f the Government obtained the documents from another source, it would have to authenticate them before they would be admissible at trial.").

206.    The ALJ determined that the Authority failed to establish the chain of custody evidence required by HISA Rule 5510(b) and thereby departed from HISA Rule 5510(b). Yet, the ALJ did not address the impact the lack of HISA Rule 5510(b) evidence had on the admissibility or evidentiary weight of the A Sample, B Sample, and Further Analysis test results.

207.    Rather than apply HISA Rule 7260(d) to the A Sample, B Sample, and Further Analysis test results, the ALJ incorrectly applied HISA Rule 3122's burden-shifting framework to conclude that Wong did not prove that the lack of HISA Rule 5510(b) chain of custody evidence caused the AAF.

208.    The ALJ's failure to apply HISA Rule 7260(d) was a violation of the HISA Rules, as was the ALJ's affirmance of the arbitrator's decision, which likewise failed to apply HISA Rule 7260(d) based on the lack of the chain-of-custody evidence required under HISA Rule 5510(b).

209.    The FTC perpetuated the ALJ's violation of HISA Rule 7260(d) by declining to review and reverse the ALJ's affirmance of the arbitrator's decision.

210.    As a direct and proximate result of the ALJ's and FTC's violation of HISA Rule 7260(d), Wong was prejudiced. Had the ALJ applied HISA Rule 7260(d) to the A Sample, B Sample, and Further Analysis test results, then the ALJ would have had to determine that the test results were unauthenticated and inadmissible based on the lack of the chain of custody evidence required under HISA Rule 5510(b). Without the test results as evidence, HIWU lacked sufficient evidence to carry its burden of proving that Wong violated HISA Rule 3212. *See* HISA Rule 3212(b)(2) ("Sufficient proof of a [HISA] Rule 3212 Anti-Doping Rule Violation is established by . . . the Covered Horse's B Sample is analyzed and the analysis of the B Sample confirms the presence of the Banned Substance . . . found in the A Sample[.]").

211.    Pursuant to *Accardi*, the FTC's Final Decision is unlawful, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and must be vacated.

**COUNT II**
**Appeal of Final Decision – Administrative Procedural Act - *Accardi* Doctrine**
**(HISA Rule 6315(b) – Independent Review by Two Certifying Scientists)**

212.    Wong adopts each of the above averments as if restated in full.

213.    A "reviewing court shall . . . hold unlawful and set aside agency action . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" and/or "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(A)-(B).

214.    The FTC is required to comply with the HISA Rules. *See United States ex rel. Accardi*, 347 U.S. at 268.

215.    HISA Rule 6315(b) mandates that "[a] minimum of 2 Certifying Scientists shall conduct an independent review of all Adverse Analytical Findings and Atypical Findings before a test result is reported."

216.    Under HISA Rule 1020, the term Certifying Scientists "means personnel appointed by a Laboratory to review all pertinent analytical data, Analytical Method validation results, quality control results, Laboratory Documentation Packages, and to attest to the validity of the Laboratory's test results."

217.    The FTC, through the ALJ, violated the HISA Rules by failing to correctly apply HISA Rule 6315(b).

218.    Specifically, the ALJ incorrectly found that UIC's director, Brendan Heffron, conducted an "independent review" of UIC's documentation and test results, even though Heffron participated in UIC's testing and analysis.

219.    The ALJ's incorrect application of HISA Rule 6315(b) misconstrued Wong's argument as suggesting that only "external scientists" may perform independent reviews, when Wong instead argued that Heffron was not independent because he performed portions of the testing that he then sought to review as a Certifying Scientist. The ALJ ignored that UIC's personnel who were not involved in the B Sample testing could have served as Certifying Scientists and conducted the independent review required by HISA Rule 6315(b).

220.    The ALJ's incorrect application of HISA Rule 6315(b) was a violation of the HISA Rules, as was the ALJ's affirmance of the arbitrator's decision, which likewise failed to correctly apply HISA Rule 6315(b).

221.    The FTC perpetuated the ALJ's violation of HISA Rule 6315(b) by declining to review and reverse the ALJ's affirmance of the arbitrator's decision.

222.    As a direct and proximate result of the ALJ's and FTC's violation of HISA Rule 6315(b), Wong was prejudiced. Had the ALJ correctly applied HISA Rule 6315(b), then the ALJ would have had to determine, pursuant to HISA Rule 7260(d), that UIC's test results were inadmissible due to violating HISA Rule 6315(b). Without UIC's B Sample test results as evidence, HIWU lacked sufficient evidence to carry its burden of proving that Wong violated HISA Rule 3212. *See* HISA Rule 3212(b)(2) ("Sufficient proof of a Rule 3212 Anti-Doping Rule Violation is established by . . . the Covered Horse's B Sample is analyzed and the analysis of the B Sample confirms the presence of the Banned Substance . . . found in the A Sample[.]").

223.    Pursuant to *Accardi*, the FTC's Final Decision is unlawful, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and must be vacated.

### COUNT III
**Administrative Procedural Act – Appeal of Final Decision – *Accardi* Doctrine (HISA Rule 3138(b) – Further Analysis)**

224.    Wong adopts each of the above averments as if restated in full.

225.    A "reviewing court shall . . . hold unlawful and set aside agency action . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" and/or "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(A)-(B).

226.    The FTC is required to comply with the HISA Rules. *See United States ex rel. Accardi*, 347 U.S. at 268.

227.    HISA Rule 3138(b) permits the Authority to conduct Further Analysis.

228.    At the time the arbitrator granted the Authority's motion requesting Further Analysis—over Wong's objection—the term Further Analysis meant "additional analysis

conducted by a Laboratory on an A Sample or a B Sample after *it* has reported an analytical result for that A Sample or that B Sample." HISA Rule 1020 (emphasis added).

229.    In other words, Further Analysis was limited to additional analysis by the Laboratory that conducted A Sample or B Sample analysis and reported an analytical result for that analysis.

230.    The arbitrator permitted UC Davis to conduct Further Analysis, even though UC Davis did not perform either the A Sample or B Sample analysis.

231.    The ALJ violated HISA Rule 3138(b) by affirming the arbitrator's decision and by rejecting Wong's argument that the Further Analysis test results should be excluded.

232.    The FTC perpetuated the ALJ's violation of HISA Rule 3138(b) by declining to review and reverse the ALJ's affirmance of the arbitrator's decision.

233.    As a direct and proximate result of the ALJ's and FTC's violation of HISA Rule 3138(b), Wong was prejudiced. Had the ALJ correctly applied HISA Rule 3138(b), then the ALJ would have had to determine, pursuant to HISA Rule 7260(d), that UC Davis's Further Analysis test results were inadmissible due to violating HISA Rule 3138(b). Without UC Davis's Further Analysis test results as evidence, HIWU lacked sufficient evidence to carry its burden of proving that Wong violated HISA Rule 3212. *See* HISA Rule 3212(b)(2),(3).

234.    Pursuant to *Accardi*, the FTC's Final Decision is unlawful, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and must be vacated.

## COUNT IV
### Administrative Procedure Act – Violation of Procedural Due Process Rights
### (U.S. Const. Amend. V)

235.    Wong adopts each of the above averments as if restated in full.

236.    A "reviewing court shall . . . hold unlawful and set aside agency action . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" and/or "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(A)-(B).

237.    "No person shall be . . . deprived of life, liberty, or property, without due process of law[.]" U.S. Const. Amend. V.

238.    Wong has a property interest in his share of the Horse's purse winnings, the fine that he must pay, and his license to train horses in states where the Authority's two-year suspension bars him from participating in training activities and Covered Horseraces. *See Woodard v. Andrus*, 419 F.3d 348, 354 (5th Cir. 2005) ("[U]nder Louisiana state law, money is property that cannot be deprived by the state absent due process."); *Hudson v. Texas Racing Comm'n*, 455 F.3d 597, 600 (5th Cir. 2006) (horse trainer "ha[d] a protected property interest in his racing license").

239.    Wong had a liberty interest in his ability to pursue his chosen profession of training horses and to earn a living in states where the Authority's two-year suspension bars him from participating in training activities and Covered Horseraces. *Cf. Conn v. Gabbert*, 526 U.S. 286, 291–92 (1999) ("[T]he liberty component of the Fourteenth Amendment's Due Process Clause includes some generalized due process right to choose one's field of private employment[.]"); *Schware v. Bd. of Bar Exam'rs*, 353 U.S. 232, 238–39 (1957) ("A State cannot exclude a person from the practice of law or from any other occupation in a manner or for reasons that contravene the Due Process or Equal Protection Clause of the Fourteenth Amendment.").

240.    The FTC, through the ALJ, deprived Wong of his property interest by affirming the arbitrator's imposition of civil sanctions against Wong, including the disqualification of the Horse's race result (resulting in the denial and disgorgement of Wong's share of the Horse's purse winnings); the fine levied against Wong, which he must pay upon completing his suspension; and

the two-year suspension barring Wong from participating in training activities and Covered Horseraces.

241.    The FTC, through the ALJ, deprived Wong of his liberty interest by affirming the arbitrator's imposition of the two-year suspension against Wong, which bars Wong from pursuing his chosen profession and earning a living in all states where he is currently barred from doing so due to the Authority's suspension.

242.    The FTC, through the ALJ, deprived Wong of his constitutionally guaranteed property interest and liberty interest without due process of law. The FTC, through the ALJ, failed to apply HISA Rules that would have required HIWU to demonstrate the authentication, admissibility, relevance, and materiality of A Sample, B Sample, and Further Analysis test results that lacked required chain of custody information. The ALJ required Wong to prove that the absent chain of custody evidence could have caused the AAF. The ALJ did not address the arbitrator's denial of Wong's request for DNA testing, which, had it been granted, would have allowed Wong to prove whether the Samples analyzed by the laboratories were the same Samples collected from the Horse.

243.    The FTC, through the ALJ, therefore deprived Wong of his property interest and liberty interest by imposing the burden of proof on Wong without providing Wong sufficient access to discovery, namely DNA testing and documents evidencing the storage and custody of the Samples before they were transported from Horseshoe to Industrial.

244.    As a direct and proximate result of the ALJ's and FTC's deprivation of Due Process, Wong was injured and prejudiced. Had Wong been provided the DNA testing and discovery he requested, then he could have proved whether the Samples analyzed by the laboratories were the same Samples collected from the Horse. Further, had the ALJ applied HISA

Rule 7260(d) to the A Sample, B Sample, and Further Analysis test results, then the ALJ would have had to determine that the test results were unauthenticated and inadmissible based on the lack of the chain of custody evidence required under HISA Rule 5510(b). Without the test results as evidence, HIWU lacked sufficient evidence to carry its burden of proving that Wong violated HISA Rule 3212. *See* HISA Rule 3212(b)(2) ("Sufficient proof of a Rule 3212 Anti-Doping Rule Violation is established by . . . the Covered Horse's B Sample is analyzed and the analysis of the B Sample confirms the presence of the Banned Substance . . . found in the A Sample[.]").

245.    Due to Wong being denied constitutionally guaranteed Due Process, the FTC's Final Decision is unconstitutional and must be vacated.

### COUNT V
### Administrative Procedure Act – Denial of Jury Trial Right
### (U.S. Const. Amend. VII)

246.    Wong adopts each of the above averments as if restated in full.

247.    A "reviewing court shall . . . hold unlawful and set aside agency action . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" and/or "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(A)-(B).

248.    "[I]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law." U.S. Const. Amend. VII.

249.    The Seventh Amendment governs all "legal" disputes, which are those disputes that are not "equity" or "admiralty"—whatever the "peculiar form," *i.e.*, common-law or statutory. *Jarkesey*, 144 S. Ct. at 2128.

250. HISA enforcement actions brought by the Authority, through HIWU, are subject to the Seventh Amendment because they may result in civil fines that are designed to punish or deter the charged person and because a HISA enforcement action closely relates to a common law cause of action for fraud. *Id.* at 2129, 2130.

251. The $25,000 fine imposed against Wong is "legal" relief within the meaning of the Seventh Amendment.

252. The HISA Rules allow for the imposition of a civil fine to punish a charged person for violating the ADMC Program resulting from his or her "nondelegable duty" to "ensure that no Banned Substance is present in the body" of the Covered Horse, or to deter the charged person from violating the HISA Rules in the future. *See* HISA Rule 3212. Further, in deciding to impose a civil fine, the arbitrator may consider the charged person's degree of fault. *See* HISA Rules 3224(a), 3325, 3223.

253. A civil fine imposed under HISA is not excepted from the Seventh Amendment as a "public right" because a HISA enforcement action is not the kind of claim that "historically could have been determined exclusively by the executive and legislative branches[.]" *Jarkesey*, 144 S. Ct., at 2132.

254. HISA enforcement actions brought by the Authority, through HIWU, are subject to the Seventh Amendment also because they closely relate to a common law cause of action for fraud. *Id.* at 2129, 2130.

255. Under 15 U.S.C. 3055(b)(1), when "developing the [ADMC Program]," the Authority must consider that:

(1) Covered horses should compete only when they are free from the influence of medications, other foreign substances, and methods that affect their performance.

(2) Covered horses that are injured or unsound should not train or participate in covered races, and the use of medications, other foreign substances, and treatment methods that mask or deaden pain in order to allow injured or unsound horses to train or race should be prohibited.

. . . .

(7) The welfare of covered horses, the integrity of the sport, and the confidence of the betting public require full disclosure to regulatory authorities regarding the administration of medications and treatments to covered horses.

256.    HISA and the HISA Rules seek to ensure fair and clean competition and "confidence of the betting public." *See, e.g.*, *Heft v. Md. Racing Comm'n*, 592 A.2d 1110, 1113 (Md. 1991) (Maryland horseracing regulations, which provided for civil fines, "[were] to assure that horse races in Maryland are 'conducted fairly, decently and clean[ly]'"); *Greenfeld v. Maryland Jockey Club*, 57 A.2d 335, 338 (1948) ("one of purposes of the [horseracing] statute and regulations was to insure that '[t]he law protects bettors against fraud'"); *State ex rel. Morris v. W. Virginia Racing Comm'n*, 55 S.E.2d 263, 275 (W. Va. 1949).

257.    Despite having the ability to initiate its enforcement action in a federal district court, which would have ensured Wong's right to a jury trial, the Authority, through HIWU, instead initiated its enforcement against Wong in HISA's administrative resolution process.

258.    The administrative resolution process did not provide for a jury trial.

259.    The FTC, through the ALJ's affirmance of the arbitrator's decision and civil sanctions, imposed against Wong a $25,000 civil fine without a jury trial.

260.    By doing so, the FTC, through the ALJ, violated the Seventh Amendment and denied Wong his right to a jury trial.

261.    As a direct and proximate result of the ALJ's and FTC's violation of the Seventh Amendment, Wong was injured and prejudiced. Had Wong been afforded his constitutional right to a jury trial by the HISA enforcement action being brought in federal district court, the outcome

may have been different. At the very least, Wong would have received all the protections of the federal court judicial system, including adjudication by a Senate-confirmed, lifetime-appointed federal district court judge; pleading standards, motion practice, and access to discovery under the Federal Rules of Civil Procedure; evidentiary rulings under the Federal Rules of Evidence, and entitlement to a jury trial.

262.    Due to Wong being denied his Seventh Amendment right to a jury trial, the FTC's Final Decision is unconstitutional and must be vacated.

**COUNT VI**
**Violation of the Private Non-Delegation Doctrine**

263.    Wong adopts each of the above averments as if restated in full.

264.    A "reviewing court shall . . . hold unlawful and set aside agency action . . . found to be arbitrary, capricious, [or] an abuse of discretion" and/or "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(A)-(B).

265.    The Fifth Circuit has held that HISA's delegation of federal regulatory power to the Authority violates the private nondelegation doctrine. *Nat'l Horsemen's Benevolent & Protective Ass'n*, 107 F.4th at 428.

266.    The Fifth Circuit's holding applies to the Authority's enforcement action against Wong.

267.    The Authority carried out and continued its enforcement action through HIWU, a private entity with which the Authority has contracted to enforce all ADMC Program violations. *See* 15 U.S.C. §§ 3055(c)(4)(B), 3054(e)(1)(E)(iv).

268.    HIWU, on the Authority's behalf, may issue subpoenas and launch investigations, 15 U.S.C. § 3054(h), impose provisional suspensions pending administrative review, HISA Rule

3229,[6] commence and prosecute enforcement actions through HISA's administrative resolution process and in federal district courts, *id.* § 3054(j), and issue guidance that sets forth "an interpretation of an existing rule, standard, or procedure" or "a policy or practice with respect to the administration or enforcement of such an existing rule." *Id.* § 3054(g)(1)(A).

269.    The Authority, through HIWU, decides "whether to investigate a covered entity for violating HISA's rules" and "whether to sanction it," and therefore, "HISA's plain terms permit only one conclusion: HISA is enforced by a private entity." *Nat'l Horsemen's Benevolent & Protective Ass'n*, 107 F.4th at 429.

270.    "That is not permitted under the private nondelegation doctrine." *Id.* at 430.

271.    The Authority, through HIWU, investigated and prosecuted Wong without any oversight by the FTC. HIWU prosecuted Wong before the arbitrator, the ALJ, and the FTC.

272.    The FTC's Final Decision, which declined to review the ALJ's affirmance of the arbitrator's decision and civil sanctions against Wong, violated the private nondelegation doctrine.

273.    As a direct and proximate result of the ALJ's and FTC's violation of the private nondelegation doctrine, Wong was injured and prejudiced.

274.    Due to Wong being enforced against in violation of the private nondelegation doctrine, the FTC's Final Decision is unlawful, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and must be vacated.

## V.    PRAYER FOR RELIEF

WHEREFORE, Wong respectfully requests that the Court:

---

[6] This power is particularly potent, as it allows the Authority to suspend a trainer without even conducting an administrative hearing, and the Authority's position is that a provisional suspension may only be lifted after the Responsible Party shows a substantial likelihood of success before the arbitrator. This standard is impossible to achieve without commencing the arbitration and requesting discovery (which will denied nonetheless).

1.      On each and all counts, declare that the ALJ's affirmance of the arbitrator's decision and civil sanctions against Wong are unenforceable due to being unlawful, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

2.      On each and all counts, enter a judgment reversing the ALJ's affirmance of the arbitrator's decision and civil sanctions against Wong and vacating the FTC's Final Decision;

3.      Preliminarily and permanently enjoin Defendants from taking any action to enforce the ALJ's affirmance of the arbitrator's decision and civil sanctions against Wong;

4.      Award Wong all nominal, compensatory, and other damages to which he may be entitled due to the violations of his constitutional rights;

5.      Award all further relief in law or equity to which Wong may be entitled; and

6.      Grant a jury trial on all issues so triable.

Respectfully submitted,

*/s/* James S. C. Baehr
James S. C. Baehr (La. Bar No. 35431)
Law Office of James Baehr LLC
609 Metairie Road, #8162
Metairie, LA 70005
Phone: (504) 475-8407
Fax:    (504) 828-3297
Email: james@baehr.law

Bradford J. Beilly (*pro hac vice* application pending)
Bradford J. Beilly, P.A.
1144 S.E. 3rd Avenue
Ft. Lauderdale, FL 33316
Phone: (954) 763-7000
Fax:    (954) 525-0404
Email: brad@beillylaw.com

Nolan M. Jackson (*pro hac vice* application pending)
J. Austin Hatfield (*pro hac vice* application pending)

Frost Brown Todd LLP
20 F Street NW, Suite 850
Washington, DC 20001
Phone: (202) 292-4150
Fax:     (202) 292-4151
Email: njackson@fbtlaw.com
Email: ahatfield@fbtlaw.com

*Counsel for Plaintiff Jonathan Wong*

0154543.0790752  4855-8079-7423v1

JONATHAN WONG

STATE OF LOUISIANA )
) s.s.
COUNTY/PARISH OF CALCASIEU )

Subscribed, sworn to before me by Jonathan Wong this 14th day of October, 2024.

My commission expires: @ DEATH

NOTARY PUBLIC

OFFICIAL SEAL
ELIZABETH K. ISTRE
NOTARY ID # 68627
STATE OF LOUISIANA
PARISH OF CALCASIEU
My Commission is for Life