**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF LOUISIANA**
**LAFAYETTE DIVISION**

| | | |
|---|---|---|
| JONATHAN WONG, | : | |
| | : | |
|     Plaintiff, | : | |
| | : | |
| v. | : | Case No. 6:24-cv-1410 |
| | : | |
| FEDERAL TRADE COMMISSION; AND | : | Hon. Judge _____ |
| HORSERACING INTEGRITY AND | : | |
| SAFETY AUTHORITY, INC., | : | |
| | : | |
|     Defendants. | : | |
| _____ | : | |

**MEMORANDUM IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

## <u>TABLE OF CONTENTS</u>

I.    FACTS ........................................................................................................................ 1

   A.  HISA's unconstitutional delegation of power to the Authority ....................................... 1

   B.  Strict liability treatment of Metformin, the substance at issue in this case..................... 2

   C.  The Authority's private enforcement through HIWU ..................................................... 4

   D.  HIWU's enforcement against Wong............................................................................... 7

II.   ARGUMENT ............................................................................................................ 11

   A.  Wong is likely to succeed on the merits. ..................................................................... 11

      1.  Count VI: Violation of the Private Nondelegation Doctrine ................................. 12

      2.  Count I: Appeal of Final Decision – *Accardi* Doctrine – HISA Rule 5510(b)........ 14

   B.  Wong has suffered and will continue to suffer irreparable harm................................... 20

   C.  The balance of hardship and public interest factors favor Wong. ................................. 22

III.  CONCLUSION ........................................................................................................ 23

## TABLE OF AUTHORITIES

**Cases**

*Am. Stewards of Liberty v. Dep't of the Interior*,
    370 F. Supp. 3d 711 (W.D. Tex. 2019)................................................................14

*Arnold v. Barbers Hill Indep. Sch. Dist.*,
    479 F. Supp. 3d 511 (S.D. Tex. 2020) ................................................................12

*Califano v. Yamasaki*,
    442 U.S. 682 (1979)..........................................................................................21

*Chevron Oil Co. v. Andrus*,
    588 F.2d 1383 (5th Cir. 1979) ..........................................................................14

*Dennis Melancon, Inc. v. City of New Orleans*,
    703 F.3d 262 (5th Cir. 2012) ......................................................................11, 22

*Dep't of Transp. v. Ass'n of Am. Railroads*,
    575 U.S. 43 (2015)............................................................................................12

*Dugan v. Delaware Harness Racing Comm'n*,
    752 A.2d 529 (Del. 2000) ................................................................................17

*Exelon Wind 1, L.L.C. v. Nelson*,
    766 F.3d 380 (5th Cir. 2014) ............................................................................17

*Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons*,
    954 F.3d 118 (2d Cir. 2020)..............................................................................18

*Fla. Businessmen for Free Enter. v. City of Hollywood*,
    648 F.2d 956 (5th Cir. 1981) ............................................................................21

*Gor v. Holder*,
    607 F.3d 180 (6th Cir. 2010) ............................................................................18

*Jackson v. Nat'l Football League*,
    802 F. Supp. 226 (D. Minn. 1992)....................................................................20

*Janvey v. Alguire*,
    647 F.3d 585 (5th Cir. 2011) ......................................................................12, 20

*Johnson Controls, Inc. v. Guidry*,
    724 F. Supp. 2d 612 (W.D. La. 2010)...............................................................21

*Mock v. Garland*,
    75 F.4th 563 (5th Cir. 2023) .............................................................................12

*Morton v. Ruiz,*
    415 U.S. 199 (1974) .................................................................................................18

*Nairne v. Ardoin,*
    715 F. Supp. 3d 808 (M.D. La. 2024) .....................................................................13

*Nat'l Horsemen's Benevolent & Protective Ass'n v. Black,*
    107 F.4th 415 (5th Cir. 2024) ..............................................................12, 13, 14, 20

*Nat'l Horsemen's Benevolent & Protective Ass'n v. Black,*
    53 F.4th 869 (5th Cir. 2022) ....................................................................................12

*Nat'l Horsemen's Benevolent & Protective Ass'n v. Black,*
    No. 5:21-CV-071-H, 2023 WL 2753978 (N.D. Tex. Mar. 31, 2023)......................20

*O.D. Jennings & Co. v. Maestri,*
    22 F. Supp. 980 (E.D. La.), *decree aff'd,* 97 F.2d 679 (5th Cir. 1938) ..................13

*Pac. Molasses Co. v. F.T.C.,*
    356 F.2d 386 (5th Cir. 1966) ............................................................................15, 19

*Powell v. Heckler,*
    789 F.2d 176 (3d Cir. 1986)....................................................................................19

*Richardson v. Joslin,*
    501 F.3d 415 (5th Cir. 2007) ..................................................................................14

*Seales v. Holder,*
    354 F. App'x 875 (5th Cir. 2009) ......................................................................15, 19

*Sierra Club, Lone Star Chapter v. F.D.I.C.,*
    992 F.2d 545 (5th Cir. 1993) ..................................................................................11

*Texas v. Cardona,*
    No. 4:23-CV-00604-0, 2024 WL 3658767 (N.D. Tex. Aug. 5, 2024) ....................19

*Texas v. Garland,*
    No. 5:23-CV-034-H, 2024 WL 967838 (N.D. Tex. Feb. 27, 2024) ........................22

*United Space All., LLC v. Solis,*
    824 F. Supp. 2d 68 (D.D.C. 2011) ..........................................................................18

*United States v. Abbott,*
    110 F.4th 700 (5th Cir. 2024) .................................................................................22

*United States v. Ceballos,*
    789 F.3d 607 (5th Cir. 2015) ..................................................................................17

*United States v. Doe*,
    465 U.S. 605 (1984)............................................................................16

*United States v. Harris*,
    No. CR 21-00247, 2024 WL 969702 (W.D. La. Mar. 6, 2024)................................13

*United States v. Harvey*,
    659 F.2d 62 (5th Cir. 1981) ....................................................................18

*United States v. Newson*,
    144 F. Supp. 464 (W.D. La. 1956)..............................................................13

*VanDerStok v. BlackHawk Mfg. Grp. Inc.*,
    639 F. Supp. 3d 722 (N.D. Tex. 2022), *appeal dismissed sub nom. VanDerStok
    v. Garland*, No. 22-11071, 2023 WL 7318088 (5th Cir. Sept. 6, 2023)................................22

*W. Alabama Quality of Life Coal. v. U.S. Fed. Highway Admin.*,
    302 F. Supp. 2d 672 (S.D. Tex. 2004) ..........................................................22

*Wages & White Lion Invs., L.L.C. v. United States Food & Drug Admin.*,
    16 F.4th 1130 (5th Cir. 2021) ..................................................................22

**Statutes**

5 U.S.C. § 702....................................................................................11

5 U.S.C. § 706(2)(A)-(B)..........................................................................11, 14

15 U.S.C. §§ 3054(g)(1)(A), (h), (j)(1)...........................................................2

**Other Authorities**

77 A.L.R.5th 201 .................................................................................16

Fed. R. Civ. P. 65(1) ............................................................................11

Fed. R. Evid. 901(a)..............................................................................16

HISA Rules .................................................................................... *passim*

U.S. Const. Art. I, § 1, Art. II, § 1, cl. 1, Art. III, § 1 .....................................12

Plaintiff Jonathan Wong, who is a horse trainer, moves for a preliminary injunction against Defendants Federal Trade Commission ("FTC") and the Horseracing Integrity and Safety Authority, Inc. ("Authority"). Wong seeks to preliminary enjoin Defendants from taking any action to enforce the final decision and civil sanctions imposed against Wong under the Horseracing Integrity and Safety Act ("HISA"). Wong's Verified Complaint (Document 1), which asserts six causes of action, challenges HISA and the regulations promulgated under HISA by the Authority ("HISA Rules") as unconstitutional and appeals the Authority's enforcement action against Wong.

For reasons of judicial economy, to reduce the need for potentially complicated briefing, and to ensure the quickest possible injunctive relief, Wong has elected to move for a preliminary injunction only on Count I and Count VI of the Verified Complaint.[1] Wong is substantially likely to succeed on both claims and has suffered, and will continue to suffer, irreparable harm as a result of Defendants' enforcement of the final decision and civil sanctions imposed against him. The Court should therefore enjoin Defendants from taking any action to enforce the final decision or civil sanctions.

I.   **FACTS**

A.     **HISA's unconstitutional delegation of power to the Authority**

For more than 100 years, thoroughbred racing in the United States has been regulated solely by states through their traditional police powers. Ver. Compl. ¶ 10. That dynamic was dramatically upended when HISA became federal law. *Id.* (citing 15 U.S.C. §§ 3051-3060). HISA purports to nationalize the regulation of horseracing across the country. *Id.* ¶ 11. To do so, HISA unconstitutionally grants to the Authority, which is a nongovernmental, private, independent, self-

---

[1] Wong is also substantially likely to succeed on Counts II, III, IV, and V and intends to seek a permanent injunction and vacatur under those claims.

regulatory, nonprofit corporation, "independent and exclusive national authority over . . . all horseracing safety, performance, and anti-doping and medication control matters for covered horses, covered persons, [and] covered horseraces." *Id.* ¶¶ 11-12 (citing 15 U.S.C. § 3054(2)). A "Covered Horse" is ***any*** thoroughbred horse that is subject to HISA, and "Covered Horserace" is ***any*** horserace involving Covered Horses. *Id.* ¶ 12 (citing 15 U.S.C. § 3051(4),(5)) (emphasis added).

Despite being a "private" entity, the Authority is empowered with broad federal regulatory authority and sits jurisdictionally within a federal regulatory agency—the FTC. *Id.* ¶ 13. Generally, the Authority may, among other things, regulate the horseracing industry throughout the United States and collect and spend fees from those it regulates. *Id.* ¶ 14 (citing 15 U.S.C. § 3052(3)(C)). Specifically, the Authority may adopt rules governing doping, medication control, and racetrack safety; investigate violations of its rules by issuing and enforcing subpoenas and instituting charges; and, upon instituting charges for violations of the rules, adjudicate its charging decisions through arbitration proceedings constructed by the Authority, under rules written by the Authority, and by an arbitrator selected and trained by the Authority. *Id.* ¶ 15; *see* 15 U.S.C. §§ 3054(g)(1)(A), (h), (j)(1); 3057(1); 3058(a)).

### B.    Strict liability treatment of Metformin, the substance at issue in this case

As part of its legislative mandate, the Authority must develop and issue HISA Rules that "list [] permitted and prohibited medications, substances, and methods, including allowable limits of permitted medications, substances, and methods." *Id.* ¶ 16 (citing 15 U.S.C. § 3055(1)(B)). "[T]he Authority shall issue, by rule in accordance with section 3053 of this title, a description of . . . anti-doping and medication control rule violations applicable to covered horses and covered persons." *Id.* (citing 15 U.S.C. § 3057(1)). The Authority did so in part by promulgating anti-

doping and medication control rules that form the Anti-Doping and Medication Control ("ADMC") Program, which is HISA Rule Series 3000. *Id.* ¶ 17 (citing 88 Fed. Reg. 5070-5201).

The ADMC Program distinguishes between Banned Substances and Controlled Substances. *Id.* ¶ 19 (citing HISA Rule 3111(a)(1)-(2)). A Banned Substance is "prohibited at all times . . . on the basis of the Agency's determination that medical, veterinary, or other scientific evidence or experience supports their actual or potential (i) ability to enhance the performance of Covered Horses, (ii) masking properties, or (iii) detrimental impact on horse welfare[.]" *Id.* (citing HISA Rule 3111(a)(1)). A Controlled Substance is allowed to be used or administered at certain times but is "prohibited to be present in a Post-Race Sample or Post-Work Sample, except as otherwise specified[.]" *Id.* (citing HISA Rule 3111(a)(1)).

Under the ADMC Program, "[i]t is the personal and nondelegable duty of the Responsible Person to ensure that no Banned Substance is present in the body of his . . . Covered Horse(s)." *Id.* ¶ 20 (citing HISA Rule 3212). A Covered Person "is therefore strictly liable for any Banned Substance . . . found to be present in a Sample collected from his . . . Covered Horse(s)." *Id.* (citing HISA Rule 3212(a) and 15 U.S.C. § 3057(a)(2)) (The Authority may impose "strict liability for covered trainers for . . . the presence of a prohibited substance or method in a sample or the use of a prohibited substance or method[.]")). Strict liability is harsh on the Covered Person but the lightest of all burdens for the Authority to prove. *Id.* ¶ 22. "[I]t is not necessary [for the Authority] to demonstrate intent, fault, negligence, or knowing use on the part of the Responsible Person in order to establish that the Responsible Person has committed a Rule 3212 Anti-Doping Rule Violation." *Id.* (citing HISA Rule 3212). Even the presence of a Banned Substance caused by environmental or inadvertent contamination is not excused. *Id.* ¶ 23.

3

The medication at issue in this case—Metformin—is regulated as a Banned Substance. *Id.* ¶ 24. Metformin is widely prescribed in the United States to humans for treatment of diabetes. *Id.* ¶ 25. In horses, small doses of Metformin result in trace-level concentrations, cause negligible effects on a horse, and do not positively or negatively impact a horse's competitive performance. *Id.* The Authority's zero-tolerance regulation of Metformin as a Banned Substance is therefore head-scratching at best, and unscientific, arbitrary, and capricious at worst. *Id.* ¶ 26. Even the Authority has acknowledged this lack of scientific evidence that Metformin is performance-enhancing in horses. *Id.* ¶ 27; *see id.* ¶¶ 28-29.

### C.    The Authority's private enforcement through HIWU

The Horseracing Integrity and Welfare Unit ("HIWU"), which is a specially created division within a private company, enforces ADMC Program violations for the Authority. *Id.* ¶¶ 34-35. An enforcement action may be brought in a United States district court or an agency-friendly administrative resolution process. *Id.* ¶ 31 (citing 15 U.S.C. § 3058(j)(1)). Given the protections of the federal judicial system, including access to discovery, it is no surprise that the Authority has never initiated an enforcement action in federal district court. *Id.* ¶¶ 32-33.

At the first level of the administrative resolution process, an arbitration is held before an arbitrator selected from an Arbitral Body. *Id.* ¶ 36. The Authority and HIWU jointly select and contract with JAMS to supply the pool of arbitrators. The arbitrators are supplied by JAMS, which the Authority and HIWU jointly selected, and are appointed by mutual agreement of the Authority and HIWU. *Id.* (citing HISA Rules 7020(a), 7030(a)). As constructed by the Authority in HISA Rule Series 7000, the arbitration is lopsided. *See id.* ¶ 39. There is no entitlement to documents or information. *Id.* ¶ 41. Document requests, subpoenas, and other requested evidence are subject to the arbitrator's discretion. *Id.* ¶¶ 42-44 (citing HISA Rule 7260). Arbitrators have routinely denied

basic discovery requests that would have been available under the Federal Rules of Civil Procedure, as occurred in Wong's case. *Id*. ¶ 45.

HIWU has "the burden of establishing that a violation . . . has occurred to the comfortable satisfaction of the [arbitrator], bearing in mind the seriousness of the allegation that is made." *Id*. ¶ 47 (citing HISA Rule 3121(a)). HIWU must prove a Rule 3212 violation, *i.e.*, presence of a Banned Substance, through testing blood and/or urine samples and scientific analysis conducted by laboratories selected by the Authority. *Id*. ¶ 48 (citing HISA Rule 3122). The laboratories' scientific analysis and testing are subject to the "Equine Standards for Laboratories and Accreditation," promulgated in Rule Series 6000. *Id*. ¶ 49. These "Laboratory Standards" carry the force of federal regulations and are binding on the Authority and FTC. *Id*. ¶ 50.

The HISA Rules require that a horse's blood and urine samples are collected for scientific testing and analysis. *Id*. ¶ 52. At the time of collection, A Samples and B Samples of blood and urine are collected in blood tubes and urine containers, respectively. *Id*. Sample collection is subject to the Equine Standards for Testing and Investigation in HISA Rule Series 5000. A Responsible Person may choose to waive laboratory analysis of the B Sample, which allows HIWU to prove a Rule 3212 violation merely by demonstrating "the presence of a Banned Substance . . . in the Covered Horse's A Sample . . ." *Id*. ¶ 53 (citing HISA Rule 3212(b)(1)). However, where the B Sample is analyzed, HIWU is deemed to have established "sufficient proof" of a HISA Rule 3212 violation by demonstrating that the "B Sample confirms the presence of the Banned Substance . . . found in the A Sample[.]" *Id*. ¶ 54 (citing HISA Rule 3212(b)(2)).

In theory, the Laboratory Standards are meant as scientific safeguards for ensuring authenticity and minimum reliability of a laboratory's analysis of Samples. *Id*. ¶ 51 (citing 15 U.S.C. § 3055(4)(D)). But the Authority's selected laboratories are "presumed to have conducted

sample analysis and custodial procedures in accordance with the Laboratory Standards [in HISA Rule Series 6000]." *Id.* ¶ 56 (citing HISA Rule 3122(c)). A Responsible Person may only "rebut this presumption by establishing that a departure from the Laboratory Standards occurred that could reasonably have caused the Adverse Analytical Finding or other factual basis for any other violation asserted." *Id.* ¶ 57 (citing HSIA Rule 3122(c)).

Cumulatively, HISA Rule 3122 establishes a "burden-shifting framework" that (1) presumes the validity of the A Sample and B Sample results, (2) requires the Responsible Person to prove that a laboratory's departure from the HISA Rules could have caused the detection of the Banned Substance (without access to discovery), and, where such a departure is proved, (3) permits HIWU to nonetheless prove its case by showing that the laboratory's departure did not result in the detection of the Banned Substance. *Id.* ¶ 58. In practice, arbitrators apply this framework to nullify the HISA Rules that do not touch upon a laboratory's testing of Samples—like chain of custody and laboratory certification requirements. *Id.*

To give enforcement its teeth, HISA directs the Authority to "develop a list of civil penalties with respect to the enforcement of rules for covered persons and covered horseraces under its jurisdiction." *Id.* ¶ 59 (citing 15 U.S.C. § 3054(i)). If HIWU proves a HISA Rule 3212 violation, the following consequences must be imposed: (1) disqualification of the horse's results, (2) forfeiture of the purse, (3) two-year period of ineligibility, *i.e.*, suspension, and (4) a fine of up to $25,000. *Id.* ¶ 60 (citing HISA Rules 1020 and 3223). Additionally, the arbitrator may require the Responsible Person to pay HIWU's share of arbitration costs. *Id.* (citing HISA Rule 3223).

The arbitrator's decision is "the final decision or civil sanction of the Authority" but is subject to review by an Administrative Law Judge ("ALJ"). *Id.* ¶ 64 (citing 15 U.S.C. § 3055(4)(B)). This is the second level of HISA's administrative resolution process. *Id.* The ALJ's

decision is subject to discretionary review by the FTC, which is the third level of HISA's administrative resolution process. *Id.* ¶ 65. After the FTC's review, or the FTC's denial of discretionary review, a Responsible Person may appeal under the Administrative Procedure Act. *Id.* ¶ 66 (citing 15 U.S.C. § 3058(c)(2)(B)). While HISA grants the FTC limited oversight, the FTC lacks power to review HIWU's enforcement decision until ***after*** enforcement is complete and penalties are imposed. *Id.* ¶¶ 67-68 (citing 15 U.S.C. § 3058).

### D.    HIWU's enforcement against Wong

Wong dreamed of working with horses since he was nine years old and rose to prominence as a highly regarded and successful trainer. *Id.* ¶¶ 81, 83-87. On June 1, 2023, Heaven and Earth ("Horse"), which Wong trained, finished first in Race 7 at Horseshoe Indianapolis. *Id.* ¶ 88. As the winner, the Horse earned a purse of $21,600, with ten percent of the winnings paid to Wong as the trainer. *Id.* ¶ 92.

As required under the HISA Rules, the Horse underwent blood and urine sample collection. *Id.* ¶ 93. The Horse's blood sample (#B100231018) and urine sample (#U100231018) (the "Samples") were collected. *Id.* ¶ 94. The Samples were kept overnight and were shipped the next day to Industrial Laboratories ("Industrial") for A Sample testing and analysis. *Id.* ¶ 95. Industrial received the Samples on June 3, 2023. *Id.* ¶ 97. Industrial conducted A Sample testing and analysis, detected the presence of Metformin in the A Samples of blood and urine, and issued an Adverse Analytical Finding ("AAF") due to the detected presence of Metformin. *Id.* ¶¶ 98-99. HIWU adopted the AAF as the basis for prosecuting Wong under the HISA Rules. *Id.* ¶ 100. On July 1, 2023, HIWU notified Wong that Industrial had issued an AAF due to the detection of Metformin in the A Samples. *Id.* ¶ 101. This was the first time that Wong learned of his alleged violation of the ADMC Program, even though a month had passed since the subject race. *Id.* ¶ 102.

On July 2, 2023, the Authority provisionally suspended Wong, which barred Wong from conducting training activities and participating in any Covered Horserace. *Id.* ¶ 103. Wong requested that the Horse's B Samples be sent to a second laboratory for B Sample testing. *Id.* ¶ 106. A week later, on July 10, 2023, Industrial shipped the B Sample of urine to the University of Illinois at Chicago Analytical Forensic Toxicology Laboratory ("UIC") for B Sample testing and analysis. *Id.* ¶ 107. More than a week after that, on July 18, 2023, Industrial shipped the B Sample of blood to UIC for B Sample testing and analysis. *Id.* ¶ 109. UIC's records show discrepancies, and UIC did not provide any shipping tracking information for its receipt of the B Samples of urine or blood. *Id.* ¶¶ 108, 111. On August 10, 2023, UIC reported the detection of Metformin in the B Samples of blood and urine. *Id.* ¶ 115.

The same day, HIWU issued a charge letter to Wong, notifying him that HIWU was charging him with an ADMC Program violation for the presence of Metformin in the Horse's Samples. *Id.* ¶ 118. Wong had one week to (1) admit the ADMC Program violation and accept, dispute, or seek to mitigate HIWU's proposed consequences or (2) deny the ADMC Program violation and dispute HIWU's proposed consequences at a "hearing in accordance with ADMC Program Rule 3261 (Protocol) and Arbitration Procedures." *Id.* ¶ 119. HIWU did not advise Wong of any option to have HIWU's enforcement brought in federal district court. *Id.* ¶ 120. Wong chose to dispute the ADMC Program violation at a hearing before an arbitrator. *Id.* ¶ 122.

Wong's pre-arbitration hearing brief identified numerous errors by Industrial and UIC in the testing and analysis of the Samples and argued that the errors rendered the laboratories' analyses inadmissible and unreliable. *Id.* ¶ 126. In response to Wong's identification of errors by Industrial and UIC, HIWU filed a motion requesting that the Kenneth L. Maddy Equine Analytical Chemistry Laboratory at the University of California, Davis ("UC Davis"), conduct Further

Analysis of the B Sample. *Id.* ¶¶ 131-132. Wong objected on several grounds, but the HIWU-selected arbitrator granted HIWU's motion. *Id.* ¶¶ 133-134.

The arbitrator twice denied document requests sought by Wong, even though the arbitrator directed Wong to narrow his initial requests and intimated that the narrowed requests would be granted. *Id.* ¶¶ 127-128, 138-139. When Wong requested that Industrial and UIC voluntarily produce relevant documents, HIWU instructed the laboratories to ignore Wong's requests. *Id.* ¶¶ 130-131. Wong's multiple requests for DNA testing were also denied. *Id.* ¶ 140. Had DNA testing been granted, it would have definitively resolved the identity issue of whether the Samples analyzed by Industrial, UIC, and UC Davis were the same Samples collected from the Horse. *Id.*

At the arbitration hearing, Wong renewed his request that HIWU's charge be dismissed and objected to HIWU's introduction of certain evidence, which the arbitrator overruled. *Id.* ¶ 149. Following the arbitration, the arbitrator issued a final decision concluding that HIWU carried its burden of proving that Wong violated Rule 3212 due to the presence of Metformin. *Id.* ¶¶ 151-152. The arbitrator found that Wong was strictly liable and was not entitled to mitigation. *Id.* ¶ 154; *see id.* ¶¶ 62-64. The arbitrator imposed against Wong civil sanctions of a two-year suspension; disgorgement of the Horse's $21,600 purse winnings; and a $25,000 fine, plus $8,000 of HIWU's share of the "adjudication costs." *Id.* ¶ 155. The Authority filed the arbitrator's decision and imposition of civil sanctions with the FTC, causing the civil sanctions to take effect. *Id.* ¶ 156.

Wong appealed for *de novo* review by the ALJ. *Id.* ¶ 157 (citing 5 U.S.C. § 3058(b), 16 C.F.R. § 1.146(b)). In relevant part, Wong argued on appeal that the arbitrator erred in her application of HISA Rule 5510. *Id.* ¶¶ 158, 159. Throughout the arbitration, Wong challenged HIWU's enforcement action for its lack of HISA Rule 5510 chain-of-custody evidence and sought dismissal of HIWU's charge—at multiple stages—based on the lack of evidence. *Id.* ¶ 159.

The ALJ affirmed the arbitrator's decision and imposition of civil sanctions. *Id.* ¶ 164. The ALJ agreed with Wong that HIWU failed to establish HISA Rule 5510's chain-of-custody evidence, holding that "[t]he Authority's failure to do so warrants a conclusion that a departure of Rule 5510(b) occurred." *Id.* ¶ 170. Nevertheless, the ALJ excused HIWU's violation of HISA Rule 5510 by applying HISA Rule 3122(d)'s unconstitutional burden-shifting framework and faulted Wong for failing to "proffer expert opinion as to whether the failure to" comply with the chain of custody requirements for refrigeration and freezing "could reasonably have led to an incorrect finding of the presence of Metformin." *Id.* ¶ 171. Thereby, the ALJ implicitly held that Wong needed to prove that the Samples were not from the Horse, ignoring that the arbitrator denied Wong's request for DNA testing, which would have been Wong's only mechanism for proving the identity of the Samples. *Id.*

Wong petitioned the FTC to reverse the ALJ's affirmance of the arbitrator's decision. *Id.* ¶¶ 165-166. The FTC resolved Wong's petition by denying review ("Final Decision"). *Id.* ¶ 180. Wong now seeks judicial review in this Court. *Id.* ¶ 181.

## II.    ARGUMENT

Wong seeks judicial review under the Administrative Procedure Act ("APA"). *See* 5 U.S.C. § 702. The APA mandates that the Court "shall . . . hold unlawful and set aside agency action" that is either (1) "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or (2) "contrary to constitutional right, power, privilege, or immunity." *Id.* § 706(2)(A)-(B). A reviewing court may "issue all necessary and appropriate" relief to "preserve status or rights pending conclusion of the review proceedings," *id.* § 705, including a preliminary injunction under Fed. R. Civ. P. 65(1).

To obtain an injunction, Wong must show "(1) irreparable injury[,] (2) substantial likelihood of success on the merits, (3) a favorable balance of hardships, and (4) no adverse effect on the public interest." *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 268 (5th Cir. 2012); *see* Fed. R. Civ. P. 65(1). Because Wong can make such a showing, the Court should enjoin Defendants from taking any action to enforce the final decision or civil sanctions imposed against Wong. The Court may do so here without a hearing because Wong's claims arise from an administrative record that is not disputed. *See Sierra Club, Lone Star Chapter v. F.D.I.C.*, 992 F.2d 545, 551 (5th Cir. 1993) (The court "may issue a preliminary injunction without an evidentiary hearing when the facts are not disputed").

### A.    Wong is likely to succeed on the merits.

Wong asserts six causes of action in the Verified Complaint. *See generally* Ver. Compl. ¶¶ 199-274. Count I asserts that the FTC's Final Decision must be vacated under the APA because the FTC misapplied or failed to apply multiple HISA Rules—in violation of the *Accardi* doctrine. Count VI asserts that the FTC's Final Decision unconstitutionally violates the private nondelegation doctrine. *Id.* ¶¶ 263-274.

Wong must show "a substantial likelihood of *ultimately* succeeding on the merits . . . potential procedural hurdles notwithstanding." *Janvey v. Alguire*, 647 F.3d 585, 599 (5th Cir. 2011) (citation omitted). To do this, Wong must allege facts sufficient to "present a prima facie case but need now show that he is certain to win." *Id.* at 596 (citation omitted). The "likelihood of success on the merits . . . is the most important of the preliminary injunction factors." *Mock v. Garland*, 75 F.4th 563, 587, n.60 (5th Cir. 2023). And while Wong is moving for injunctive relief on both Count I and Count VI, "he need only present a prima facie case on one of them." *Arnold v. Barbers Hill Indep. Sch. Dist.*, 479 F. Supp. 3d 511, 519 (S.D. Tex. 2020).

### 1. Count VI: Violation of the Private Nondelegation Doctrine

The private nondelegation doctrine derives from the Constitution's Vesting Clauses. *See* U.S. Const. Art. I, § 1, Art. II, § 1, cl. 1, Art. III, § 1; *Dep't of Transp. v. Ass'n of Am. Railroads*, 575 U.S. 43, 87-88 (2015) (J. Thomas, concurring) ("Although no provision of the Constitution expressly forbids the exercise of governmental power by a private entity, our so-called "private nondelegation doctrine" flows logically from the three Vesting Clauses."). The doctrine reinforces the "commonsense principle" that "a private entity may wield government power only if it 'functions subordinately' to an agency with 'authority and surveillance' over it." *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869, 880-81 (5th Cir. 2022). If, as here, "the private entity does not function subordinately to the supervising agency, [then] the delegation of power is unconstitutional." *Id.*

The Fifth Circuit determined in a recent decision that HISA's enforcement provisions "violate the private nondelegation doctrine." *See Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 107 F.4th 415, 435 (5th Cir. 2024) ("*Horsemen's II*"). "District courts are bound by their circuit's decisions unless a decision is overturned by an en banc decision of their circuit court or

the Supreme Court." *Nairne v. Ardoin*, 715 F. Supp. 3d 808, 832 (M.D. La. 2024); *see, e.g., United States v. Harris*, No. CR 21-00247, 2024 WL 969702, at *3 (W.D. La. Mar. 6, 2024) (rejecting a defendant's arguments that were previously addressed by the court and the Fifth Circuit); *United States v. Newson*, 144 F. Supp. 464, 466 (W.D. La. 1956) (decisions of the Fifth Circuit are "binding"); *O.D. Jennings & Co. v. Maestri*, 22 F. Supp. 980, 983 (E.D. La.), *decree aff'd*, 97 F.2d 679 (5th Cir. 1938) ("[T]he obligation of a district court to follow the decision of its own Circuit Court of Appeals is of course too fundamental to require other than mere statement."). "As the Fifth Circuit has already concluded that [HISA's enforcement provisions violate the private nondelegation doctrine], this Court is bound to this decision and [should] not rule counter to its precedent." *Id.*

Even if the Court were inclined to explore *Horsemen II's* precedential value, the Fifth Circuit's decision clearly applies here. The broad enforcement powers delegated to the Authority, as analyzed in *Horsemen II's*, are the same enforcement powers exercised by the Authority and HIWU against Wong. The Authority, through the privately contracted HIWU, charged, provisionally suspended, adjudicated, and levied sanctions against Wong—"all without the say-so of the [FTC]." *See Horsemen's II*, 107 F.4th at 429-30.

Any argument by Defendants that the Authority's "enforcement power is subordinate to the FTC" because "the FTC at least partially supervises the Authority because it can review sanctions at the back end, after ALJ review," should fail. *See id.* at 430. This argument ignores "everything the Authority [is] permitted to do up [until]" the FTC's decision whether to grant discretionary review of the ALJ's decision. *Id.* Take Wong's case, for example—HIWU "charge[d]," "adjudicate[d]," and "fine[d]" Wong "without any supervision by the FTC." *Id.*; *see* Ver. Compl. 100-101, 103, 116, 118-119, 151-152, 154-156, 164, 180. Moreover, HIWU's provisional

suspension of Wong before and after the B Sample testing and analysis occurred went "into [immediate] effect" and was not stayed. *Horsemen's II*, 107 F.4th at 430; Ver. Compl. ¶¶ 112, 114, 116.

Based on *Horsemen's II*, the Authority's enforcement against Wong, through HIWU, violated the private nondelegation doctrine. The FTC's Final Decision, which declined to review and left intact the arbitrator's final decision and imposition of civil sanctions against Wong, must therefore be vacated as "unlawful, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" *See id.* ¶ 274; 5 U.S.C. § 706(2)(A)-(B). Considering the binding precedent of *Horsemen's II*, Wong is substantially likely to succeed on Count XI.

### 2.  Count I: Appeal of Final Decision – *Accardi* Doctrine – HISA Rule 5510(b)

Count I is Wong's appeal of the FTC's Final Decision under the *Accardi* doctrine. *See* Ver. Compl. ¶¶ 199-211. The *Accardi* doctrine stands for "the unremarkable proposition that an agency must abide by its own regulations." *Chevron Oil Co. v. Andrus,* 588 F.2d 1383, 1386 (5th Cir. 1979). The doctrine derives from *United States ex rel. Accardi v. Shaughnessy*, in which the U.S. Supreme Court invalidated the Attorney General's deportation order because the Justice Department had failed to follow the "regulations prescrib[ing] the procedure to be followed in processing an alien's application for suspension of deportation." 347 U.S. 260, 265 (1954).

Under the *Accardi* doctrine, an agency's "failure to afford an individual procedural safeguards required under its own regulations may result in the invalidation of the ultimate administrative determination." *Richardson v. Joslin*, 501 F.3d 415, 418 (5th Cir. 2007). An agency's violation of the *Accardi* doctrine renders the agency action both not "in accordance with law" and "arbitrary and capricious" under the APA. *See, e.g., Am. Stewards of Liberty v. Dep't of the Interior*, 370 F. Supp. 3d 711, 728 (W.D. Tex. 2019) (collecting cases). To prove a violation,

Wong need only "show that he was prejudiced by the violation." *Seales v. Holder*, 354 F. App'x 875, 879-80 (5th Cir. 2009). "If an agency in its proceedings violates its rules and prejudice results, ***any action taken as a result of the proceedings cannot stand***." *Pac. Molasses Co. v. F.T.C.*, 356 F.2d 386, 389 (5th Cir. 1966) (emphasis added).

Count I alleges that the FTC violated HISA Rules 5510 and 7260 through the ALJ's affirmance of the arbitrator's decision and imposition of civil sanctions against Wong. Ver. Compl. ¶¶ 202-203, 206-209. Under HISA Rule 7260(d), the ALJ was obligated, on *de novo* review, to "determine the admissibility" of evidence of the Samples' test results, including their authenticity. However, instead of determining the Samples' authenticity in the context of HISA Rule 5510's chain-of-custody evidence requirement, the ALJ misapplied HISA Rule 3120's burden-shifting framework to require that Wong disprove their authenticity. The ALJ accordingly violated the HISA Rules, and the FTC's Final Decision cannot stand.

HISA Rule 5510 states:

(a) After Sample collection, the DCO or BCO shall store Samples in a manner that protects the integrity, identity, and security, prior to transport to the Laboratory.
(b) If a urine or blood Sample is not transported to the Laboratory on the day of collection:
(1) the relevant Sample Collection Personnel shall store the urine Sample in a secure freezer or refrigerator; and
(2) the relevant Sample Collection Personnel shall store the blood Sample in a secure refrigerator;
(3) and, in each case, shall document in the Chain of Custody the location and time in and time out of the urine or blood Sample.
(c) The DCO or BCO shall document who has custody of the Samples or who is permitted access to the Samples.
(d) The Agency shall develop a system for recording the Chain of Custody of Samples and receiving Sample Collection Session documentation to ensure that each Sample is securely handled and the documentation for each Sample is completed.

HISA Rule 5510(b)'s requirements applied because the Horse's Samples were "not transported" to Industrial "on the day of collection." *Id.* ¶¶ 94-96. The ALJ agreed that the Authority and HIWU

failed to demonstrate the Horse's Samples were stored and held in custody in the manner required by HISA Rule 5510(b). *See id.* ¶ 159. It is undisputed that there was no evidence that the Horse's urine Sample was stored "in a secure freezer or refrigerator," that the Horse's blood Sample was stored "in a secure refrigerator," that the location where the Samples were stored and their "time in and time out" of storage were documented, or that "who ha[d] custody" or "who [was] permitted access" to the Samples was documented.

Evidence demonstrating compliance is essential to effectuating HISA Rule 5510's purpose of ensuring that samples are "store[d] . . . in a manner that protects the integrity, identity, and security, prior to transport to the Laboratory." Indeed, HISA Rule 5510(b)'s requirements go to the heart of ensuring that samples can be authenticated. It is axiomatic that evidence must be authenticated to be admissible. *See* Fed. R. Evid. 901(a); Rule 7260(d) ("the Federal Rules of Evidence may be used for guidance" in determining "the admissibility, relevance, and materiality of the evidence offered"). In the case of a blood or urine specimen, as here, authentication "requires accounting for the sample's handling from the time it was first collected until the time it was analyzed." *See* 77 A.L.R.5th 201. "Unless the sample can be authenticated by other means, failure to make this accounting renders inadmissible the sample and any results of analysis of the sample." *Id.* HISA Rule 5510(b)'s authentication requirement goes to authentication of the Samples and—under HISA Rule 7260(d)—to the evidentiary admissibility and reliability of the test results analyzing the samples. *Cf. United States v. Doe*, 465 U.S. 605, 614 (1984) ("[I]f the Government obtained the documents from another source, it would have to authenticate them before they would be admissible at trial.").

On appeal, the ALJ agreed that the Authority failed to establish the chain of custody evidence required by HISA Rule 5510(b) and thereby departed from HISA Rule 5510(b). Ver.

Compl. ¶¶ 170, 206. Yet, the ALJ did not address the impact that the lack of HISA Rule 5510(b) evidence had on the admissibility of the A Sample, B Sample, and Further Analysis test results. *Id.* ¶ 206. In tandem with HIWU's obligation to "present evidence to support its charge," *see* HISA Rule 7250(a), HISA Rule 7260(d) requires the arbitrator to "determine the admissibility, relevance, and materiality of the evidence offered." Due to having the burden of proof under HISA Rule 3120(a), HIWU must, under HISA Rule 7260(d), authenticate the evidence it offers. *Cf. United States v. Ceballos*, 789 F.3d 607, 618 (5th Cir. 2015) ("[O]nce the proponent has made the requisite preliminary showing of authenticity, the evidence should be admitted[.]"). The ALJ did not address the arbitrator's failure to consider the admissibility or authenticity of the evidence of the tests results of the Samples. Nor did the ALJ address these issues himself.

Considering his ruling that HIWU violated HISA Rule 5510(b), the ALJ was required on *de novo* review to apply HISA Rule 7260(d)'s admissibility determination to the A Sample, B Sample, and Further Analysis test results. Ver. Compl. ¶ 207. But instead, the ALJ incorrectly applied HISA Rule 3122's burden-shifting framework against Wong and concluded that Wong did not prove that the lack of HISA Rule 5510(b) chain-of-custody evidence caused the AAF, which Wong of course could not do without discovery or DNA testing.[2] *Id.* ¶¶ 173, 207. By prematurely applying HISA Rule 3122's burden-shifting framework to presume the validity of the A Sample, B Sample, and Further Analysis test results, the ALJ invalidated HISA Rule 7260(d)'s mandate that the "admissibility, relevance, and materiality" of HIWU's evidence be determined. The ALJ thereby rendered HISA Rule 7260(d)'s evidentiary considerations superfluous. *See also Exelon*

---

[2] *See Dugan v. Delaware Harness Racing Comm'n*, 752 A.2d 529, 531 (Del. 2000) ("[T]he Commission adopted a rule of evidence that was conditioned expressly upon its subsequent establishment of certain additional procedural safeguards. Those procedures were not extant at the time of Dugan's alleged violation. Therefore . . . any blood test evidence of its violation was inadmissible [and] . . . all of the sanctions imposed on the basis of Dugan's alleged violation are invalid.") (applying *Accardi*).

17

*Wind 1, L.L.C. v. Nelson*, 766 F.3d 380, 399 (5th Cir. 2014) ("When presented with two plausible readings of a regulatory text, this court common-sensically . . . prefers the reading that does not render portions of that text superfluous."). If HISA Rule 3122's burden-shifting were allowed to operate in this way, *i.e.*, to unadmitted evidence, then it would nullify HISA Rules 7250 and 7260(d), and *Accardi*, itself.

The ALJ entirely failed to apply HISA Rule 7260(d), and his failure violated the *Accardi* doctrine. As in *Pacific Molasses Co.*, which involved the FTC's failure to comply with its own rules, the ALJ's violation of HISA Rule 7260(d), which the FTC perpetuated through its Final Decision, violated the *Accardi* doctrine and "constituted a denial of administrative due process." *United States v. Harvey*, 659 F.2d 62, 64 (5th Cir. 1981) ("In *Pacific Molasses Co. v. F.T.C.*, this court held that the FTC's failure to comply with its Rules of Practice as promulgated in the Code of Federal Regulations constituted a denial of administrative due process.").

The *Accardi* doctrine's mandate that the ALJ and the FTC follow the HISA Rules goes hand in hand with Due Process requirements. The "'established maxim' [is] that agencies must 'adhere to their own rules.'" *United Space All., LLC v. Solis*, 824 F. Supp. 2d 68, 82 (D.D.C. 2011) (quoting *Vietnam Veterans v. Sec'y of Navy*, 843 F.2d 528, 536 (D.C. Cir. 1988)). This principle is "deeply rooted" and "elemental." *Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118, 130 (2d Cir. 2020); *Gor v. Holder*, 607 F.3d 180, 191 (6th Cir. 2010) (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545 (6th Cir. 2004)). Relatedly, "agencies may not violate their own rules and regulations to the prejudice of others." *Solis*, 824 F. Supp. 2d at 82 (quoting *Battle v. FAA*, 393 F.3d 1330, 1336 (D.C. Cir. 2005)). "This is so even where the internal procedures are possibly more rigorous than otherwise would be required." *Morton v. Ruiz*, 415 U.S. 199, 235 (1974) ("Where the rights of individuals are affected, it is incumbent upon agencies to follow their

own procedures."). In reviewing "an agency's observance and implementation of its self-prescribed procedures," the ALJ, "to protect due process, must be particularly vigilant and must hold agencies . . . to a strict adherence to both the letter and the spirit of their own rules and regulations." *Powell v. Heckler*, 789 F.2d 176, 178 (3d Cir. 1986) (reversing and remanding for reinstatement of ALJ's decision in favor of claimant). Considering the "well-settled rule," HIWU's "failure to follow" HISA Rule 5510(b), and the ALJ's failure to analyze the violation under HISA Rule 7260(d), should have been fatal to HIWU's charge against Wong. *See id.* (quoting *IMS, P.C. v. Alvarez*, 129 F.3d 618, 621 (D.C. Cir. 1997)).

Wong was prejudiced by the ALJ's violation of HISA Rules 5510(b) and 7260(d). Ver. Compl. ¶ 210. Had the ALJ applied HISA Rule 7260(d) to the A Sample, B Sample, and Further Analysis test results, then the ALJ would have determined that the test results were unauthenticated and inadmissible based on the lack of the chain-of-custody evidence required under HISA Rule 5510(b). *Id.* Without the test results as evidence, HIWU lacked sufficient evidence to carry its burden of proving that Wong violated HISA Rule 3212. HISA Rule 3212(b)(2) ("Sufficient proof of a [HISA] Rule 3212 Anti-Doping Rule Violation is established by . . . the Covered Horse's B Sample is analyzed and the analysis of the B Sample confirms the presence of the Banned Substance . . . found in the A Sample[.]").

Wong is likely to succeed in proving that the FTC, through the ALJ, violated the *Accardi* doctrine by failing to apply HSIA Rules 5510(b) and 7260(d) and that Wong was prejudiced as a result. *See Seales*, 354 F. App'x at 879-80. Wong is therefore likely to prevail on Count I because, due to the *Accardi* doctrine violation, the FTC's Final Decision "cannot stand." *Pac. Molasses Co.*, 356 F.2d at 389; *see Texas v. Cardona*, No. 4:23-CV-00604-0, 2024 WL 3658767, at *27 (N.D. Tex. Aug. 5, 2024) ("Once a court determines the contested agency action falls short of the

APA's substantive or procedural requirements, the reviewing court *'shall' set aside* the unlawful agency action.") (emphasis added) (citing *Data Mktg. P'ship, L.P. v. U.S. Dep't of Lab.*, 45 F.4th 846, 854 (5th Cir. 2022)).

### B.    Wong has suffered and will continue to suffer irreparable harm.

Wong must show he has suffered or will suffer irreparable harm. Harm is "irreparable" and "where there is no adequate remedy at law, such as monetary damages." *Janvey*, 647 F.3d at 600. The arbitrator's decision and imposition of civil sanctions, which the ALJ affirmed and which the FTC declined to review, have caused Wong irreparable harm in multiple respects.

First, Wong has nine months remaining on the suspension imposed against him under enforcement provisions that the Fifth Circuit deemed to be unconstitutional. The suspension bars Wong from participating in HISA-regulated training activities and Covered Horseraces in every state outside the Fifth Circuit, denying Wong once-in-a-lifetime racing opportunities involving horses that he previously trained and would have continued to train but for the suspension. Ver. Compl. ¶¶ 105, 189-190, 193. Even in Louisiana, in which HISA's enforcement is stayed under *Horsemen's II*, the suspension has been the basis for denying Wong training and racing benefits he was provided prior to his suspension, such as stalls for his horses at the tracks. *Id.* ¶¶ 190-192. As courts have held, illegal restraints and restrictions against participating in sporting events constitute irreparable harm. *See Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, No. 5:21-CV-071-H, 2023 WL 2753978, at *6-7 (N.D. Tex. Mar. 31, 2023) ("Other courts have concluded that plaintiffs can 'make a sufficient showing of irreparable harm' by demonstrating that they 'remain restricted under an illegal system' or rule in a sporting event that would lead to disqualification." (collecting cases) (enjoining HISA enforcement)); *Jackson v. Nat'l Football League*, 802 F. Supp. 226, 230-31 (D. Minn. 1992) ("[T]he four players who remain restricted by

the Plan B rules make a sufficient showing of irreparable harm because they suffer irreparable injury each week that they remain restricted under an illegal system of player restraints.").

Second, HIWU's provisional suspension required Wong to transfer 150 horses out of his care almost overnight. Ver. Compl. ¶¶ 104-106, 195. This caused Wong to immediately lose customers, goodwill, and business. *Id.* ¶ 195. *See Johnson Controls, Inc. v. Guidry*, 724 F. Supp. 2d 612, 626 (W.D. La. 2010) (" . . . [A] loss of a business' customers and damage to its goodwill are widely recognized as injuries incapable of ascertainment in monetary terms and may thus be irreparable[.]") (citation omitted); *Fla. Businessmen for Free Enter. v. City of Hollywood*, 648 F.2d 956, 958, n.3 (5th Cir. 1981) (citing cases holding that, "if customers are likely to stop patronizing a supplier because it can no longer continue to provide goods or services available elsewhere, the impossibility of calculating the value of this loss of goodwill amounts to irreparable injury"). At least one of Wong's former clients holds Wong in low regard, going so far as kicking Wong and his family out of the house that the former client was providing at the time of Wong's provisional suspension. Ver. Compl. ¶ 196. Wong attests that the economic value of his losses is difficult—if not impossible—to quantify. *Id.* ¶ 197.

Unless Defendants are enjoined from their continued enforcement of Wong's suspension, Wong will continue to suffer irreparable harm, including the loss of once-in-a-lifetime racing opportunities. *Id.* at ¶ 193. Even if the civil fine imposed against Wong and disgorgement of purse winnings can be remedied through damages, the FTC's Final Decision upholding Wong's two-year suspension is causing and will continue to cause irreparable harm that cannot be remedied unless enjoined. The injunction of the suspension is consistent with the relief that Wong is entitled to, as Wong's eventual success under either Count I or Count VI would result in vacatur of the FTC's Final Decision and all sanctions imposed against Wong. *See Califano v. Yamasaki*, 442

U.S. 682, 702 (1979) ("[T]he scope of injunctive relief is dictated by the extent of the violation established[.]").

> ### C.      The balance of hardship and public interest factors favor Wong.

Finally, the Court must "balance the hardships on each party of either granting or withholding the requested relief," *W. Alabama Quality of Life Coal. v. U.S. Fed. Highway Admin*., 302 F. Supp. 2d 672, 685 (S.D. Tex. 2004) (citations omitted), and consider the "public's interest" in granting or denying injunctive relief, *Dennis Melancon, Inc.*, 703 F.3d at 268. Since the FTC is a party, these factors are merged. *United States v. Abbott*, 110 F.4th 700, 719 (5th Cir. 2024). Here, Defendants will not be harmed if they cannot enforce the final decision or civil sanctions imposed against Wong. *See VanDerStok v. BlackHawk Mfg. Grp. Inc.*, 639 F. Supp. 3d 722, 731 (N.D. Tex. 2022) (granting injunction) (alleged harm to government did not "outweigh the harm to the public's interest in a government that abides by its own statutory and constitutional obligations"), *appeal dismissed sub nom. VanDerStok v. Garland*, No. 22-11071, 2023 WL 7318088 (5th Cir. Sept. 6, 2023). Likewise, there is "no public interest in the perpetuation of" the FTC's Final Decision because it is an "unlawful agency action," as addressed above. *See Wages & White Lion Invs., L.L.C. v. United States Food & Drug Admin.,* 16 F.4th 1130, 1143 (5th Cir. 2021) (citation omitted). Rather, the "public interest is in having governmental agencies abide by the federal laws that govern their existence and operations." *Id.*; *Texas v. Garland*, No. 5:23-CV-034-H, 2024 WL 967838, at *50 (N.D. Tex. Feb. 27, 2024) ("There is little valuable interest in enforcing statutes promulgated in violation of the Constitution."). The balance-of-hardships and public interest factors therefore weigh entirely in favor of granting injunctive relief.

## III.    CONCLUSION

Wong is entitled to an injunction under Fed. R. The Court should therefore enjoin Defendants from taking any action to enforce the final decision or civil sanctions imposed against Wong under the FTC's Final Decision.

Respectfully submitted,

/s/ James S. C. Baehr
James S. C. Baehr (La. Bar No. 35431)
Law Office of James Baehr LLC
609 Metairie Road, #8162
Metairie, LA 70005
Phone: (504) 475-8407
Fax:    (504) 828-3297
Email: james@baehr.law

Bradford J. Beilly (*pro hac vice* application pending)
Bradford J. Beilly, P.A.
1144 S.E. 3rd Avenue
Ft. Lauderdale, FL 33316
Phone: (954) 763-7000
Fax:    (954) 525-0404
Email: brad@beillylaw.com

Nolan M. Jackson (*pro hac vice* application pending)
J. Austin Hatfield (*pro hac vice* application pending)
Frost Brown Todd LLP
20 F Street NW, Suite 850
Washington, DC 20001
Phone: (202) 292-4150
Fax:    (202) 292-4151
Email: njackson@fbtlaw.com
Email: ahatfield@fbtlaw.com

*Counsel for Plaintiff Jonathan Wong*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 16, 2024, the forgoing was electronically filed with the Clerk of the Court by using the CM/ECF System, which will effectuate service upon all persons who have consented to electronic service.

<u>/s/ James S. C. Baehr</u>
*Counsel for Plaintiff Jonathan Wong*

0154543.0790752   4868-8204-8752

24